UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

LOUISE SETELIUS,

                Plaintiff,

      v.

NATIONAL GRID ELECTRIC SERVICES LLC
and HANK DELACH, *in his official and individual capacities*,

                Defendants.

**MEMORANDUM & ORDER**
11-CV-5528 (MKB)

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Louise Setelius brings this action against Defendants National Grid Electric Services LLC ("National Grid") and Hank Delach, alleging claims of gender discrimination, retaliation and creation of a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and violations of the Equal Pay Act, 29 U.S.C. § 206(d). Defendants moved for summary judgment as to all claims. The Court heard oral argument on September 16, 2014. For the reasons set forth below, the Court grants Defendants' motion for summary judgment.

## I. Background

### a. Plaintiff's work with National Grid and supervision by Delach

      Plaintiff began her employment with Long Island Lighting Company, a predecessor to National Grid, in 1986. (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.) Plaintiff began working as a clerk in the tree trim department, was promoted to work coordinator in 2001, and to field supervisor in 2004. (Def. 56.1 ¶¶ 1–2; Pl. 56.1 ¶¶ 1–2.) At the time Plaintiff was promoted to field supervisor, she

did not have a college degree, prior relevant supervisory experience, and had not worked in the field. (Def. 56.1 ¶ 40; Pl. 56.1 ¶ 40.) Her salary was increased by $3,350 from her base pay of $57,800 as a work coordinator, based on "merit and market forces." (Def. 56.1 ¶ 42; Pl. 56.1 ¶ 42.)

In or about November 2008, Hank Delach became Plaintiff's supervisor and remained Plaintiff's supervisor until January 2011. (Deposition of Louise Setelius, annexed to Affidavit of Louse Setelius ("Setelius Aff.") as Ex. 1 ("Pl. Dep.") 19:24–20:9.) According to Plaintiff, Delach was "nasty" to her, and would yell and scream at her in front of other employees. (*Id.* at 105:2, 106:2–14.) Delach also "criticized, belittled, and nitpicked minor details" about Plaintiff's work on a "near daily basis," making "baseless" assertions that Plaintiff was "incompetent" and "an idiot," and that her "work [wa]s all wrong" or she "ha[d]n't done her job." (Setelius Aff. ¶ 7.) During monthly safety meetings, Delach would "single[] out" Plaintiff to make sure the food was there on time, make copies, and "make sure any kind of clerical function" was done, "because . . . that was [her] job beforehand." (Pl. Dep. 116:19–25.) Delach did not ask male field supervisors to perform these tasks. (*Id.* at 116:24–25.) Delach excluded Plaintiff from informal and formal meetings with safety supervisors that male field supervisors attended, and did not update Plaintiff with the decisions made at these meetings, although he updated male field supervisors. (Setelius Aff. ¶ 3.) Delach also did not distribute to Plaintiff the minutes of monthly meetings that were held between management (at Delach's level) and union employees concerning work methods, incidents and accidents, although he emailed the minutes to male field supervisors.[1] (*Id.* ¶ 4.)

---

[1] Neither Delach nor Plaintiff were asked about or discussed the alleged exclusion by Delach of Plaintiff from these meetings during their deposition testimony.

On March 6, 2009, Delach spoke with Plaintiff about her job performance, criticized Plaintiff's performance and suggested that she apply for a position that would be a demotion. (*Id*. ¶ 9.) In February 2009, National Grid posted an internal announcement for a work coordinator position in the Hicksville office, and Plaintiff applied for the position in March 2009. (Def. 56.1 ¶¶ 36–37; Pl. 56.1 ¶¶ 36–37; Pl. Dep. 205:11–12.) According to Plaintiff, she applied for the position, even though it was technically a demotion, because she did not like the way she was being treated by Delach in her field supervisor position. (Pl. Dep. 205:11–207:2; Compl. ¶ 24.) National Grid interviewed a total of 17 candidates, but did not fill the vacancy and instead closed the position. (Def. 56.1 ¶¶ 37, 39; Pl. 56.1 ¶¶ 37, 39.) Plaintiff concedes that the position was closed, but contends that "they moved Paul Turner," a work coordinator, into the Hicksville office in December 2009. (Pl. Dep. 206:7–13.)

In December 2010, Plaintiff sought permission from Delach to attend a women's conference sponsored by National Grid in Boston, Massachusetts. (*Id*. at 91:7–25.) Delach denied Plaintiff permission to attend due to budgetary restrictions. (*Id*. at 92:2–17.)

According to Plaintiff, as a result of a medical condition, she was required to see a doctor every three to four months to have her blood drawn. (Setelius Aff. ¶ 6.) The doctor's office was located approximately 30 minutes away from her office, and received patients only during normal business hours. (*Id*.) Delach complained about Plaintiff leaving work to make these doctor's appointments, and asked her to find a doctor located closer to the office. (*Id*.) In contrast, Delach did not complain about another field supervisor, Sal Marinello, when Marinello left work for doctor's appointments approximately twice per month, even though these visits often resulted in Marinello's absence from the office for the entire afternoon. (*Id*. ¶¶ 3, 6.)

Delach also permitted Marinello to leave early approximately two to three additional times each month to attend to personal business, without comment or reprimand.  (*Id*. ¶ 6.)

**b.  Plaintiff's complaints about Delach**

In March 2009, Plaintiff spoke with Joe Dwyer, a supervisor in charge of health and safety, and informed him that she "was having problems with" Delach "and the way [she] was being treated."  (Pl. Dep. 114:3–8.)  Plaintiff told Dwyer, "I had never been treated by any employee in the company like that.  I didn't deserve to be treated like that.  I was an employee.  I was a human being and I was being treated like dirt."  (*Id*. at 113:4–114:8.)  Plaintiff discussed "the way I was spoken to, the way I was yelled at, the way I was yelled at in front of my fellow employees."  (*Id*. at 115:6–8.)

Plaintiff spoke with Dwyer again in late 2009 or early 2010 about the "same set of circumstances, . . . the unnecessary yelling."  (*Id*. at 119:15–18.)   On both occasions Dwyer informed Plaintiff that he would speak with Delach.  (*Id*. at 118:8–12, 119:21–120:4.)

In mid-2009, Plaintiff  "in passing, mentioned" to Rich Hohlman, a vice president in National Grid, that she "was having problems with [her] supervisor."  (Setelius Aff. ¶ 14; Pl. Dep. 111:15–112:17.)  Hohlman "acknowledged" Plaintiff and Plaintiff did not speak to Hohlman again after that encounter.  (Pl. Dep. at 112:4–9.)

**c.  Conduct of co-workers**

According to Plaintiff, on an unspecified date, Paul Mondello, a fellow field supervisor, screamed and yelled at Plaintiff over the telephone in an "unprofession[al]" and "abominable" manner.  (Pl. Dep. 196:12–198:4.)  Plaintiff called Mondello's supervisor, Pete Zarcone, and said "I'm not going to tolerate this behavior. He is treating me as if I'm some kind of insignificant

insubordinate piece of garbage. I'm not going to tolerate it. If I was [a] man, he wouldn't be yelling at me. He feels he could yell at me because I was a woman." (*Id.* at 198:4–10.)

Plaintiff states that in September and November 2010, James Luckie, another fellow male field supervisor, told her "I would like to touch your butt," or "I want to put my hands on your butt." (Setelius Aff. ¶ 15.) In September 2010, Delach, Luckie and another co-worker, Albert Carlon, commented on a female co-worker's breasts in Plaintiff's presence, "Oh, I'd like to see those," and "I'd like to rub those," which made Plaintiff uncomfortable.[2] (*Id.* ¶ 16.)

### d. Installation of underground power lines at Plaintiff's home

According to Plaintiff, in May 2009, Albert Carlon, a work coordinator who supervised the installation of underground electrical lines for National Grid, told Plaintiff that his workers were installing underground electrical lines near her home, and suggested that the lines could be installed at her house if she desired. (Setelius Aff. ¶ 10.) According to Defendants, customers were charged $2,000 for the installation of underground electrical service at their homes. (Affidavit of Christopher Dorsey, annexed to Defs. Notice of Motion for Summary Judgment at Docket Entry No. 32 ("Dorsey Aff.") ¶ 12.) Plaintiff agreed to have the underground lines installed, and expected that she would receive a bill for the service. (Setelius Aff. ¶ 10.) The underground lines were installed by an independent contractor working on behalf of National Grid, and, according to Plaintiff, she did not have the authority to generate the work order that was required to install the underground lines or to direct the contractor to perform the work. (*Id.*)

On or about May 9, 2009, National Grid received an anonymous complaint that Plaintiff used a National Grid contractor to install an underground electrical service at her personal

---

[2] Plaintiff does not allege that she complained about these comments.

residence, without paying for the installation.[3]  (Def. 56.1 ¶ 8; Pl. 56.1 ¶ 8; untitled notes

annexed to Setelius Aff. as Ex. 11 ("Investigation Notes") at 4.)[4]  National Grid's Standards of

Conduct provide that all employees must avoid situations that create "even the appearance of

impropriety," cannot "use their positions [and the] opportunities discovered through their

position, and company resources . . . for personal gain," and must "protect company resources

you work with or are responsible for."  (Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6; Dorsey Aff. ¶ 8; National

Grid Standards of Ethical Business Conduct ("Standards of Conduct"), annexed to Dorsey Aff.

as Ex. 1 at 8.)

> **e.  Investigation of underground power lines at Plaintiff's home**

In May 2009, Christopher Dorsey, a lead analyst in the National Grid ethics and

compliance office, and Kevin McConnell, a lead program manager in the human resources

department, commenced an investigation into the allegation.  According to the Investigation

Notes kept by Dorsey and/or McConnell, a site visit by the Revenue Protection department

confirmed that there was an underground electrical service installed at Plaintiff's home, which

had not been energized.  (Investigation Notes 1.)

In June 2010, Dorsey, and McConnell met with Plaintiff to question her about these

allegations.  (Dorsey Aff. ¶ 11.)  According to Defendants, during the interview Plaintiff

admitted to having used a National Grid contractor to install the underground electrical lines, and

---

[3]  According to the deposition testimony of Richard Romano, a principal partner at National Grid, the call was received on a hotline that was available only to National Grid employees.  (Deposition of Richard Romano, annexed to Setelius Aff. as Ex. 3 ("Romano Dep.") 17:9–18:15.)

[4]  These notes are annexed to Plaintiff's Affidavit as Exhibit 11.  The notes do not include a title, description or the name of the author.  Plaintiff refers to these as "notes taken during the investigation."  (Pl. Opp'n Mem. 15.)  Defendants do not dispute the authenticity or reliability of these documents.

also admitted that she did not pay for the installation or make inquiries about the bill for the installation. (*Id.* ¶ 11.) According to Plaintiff, she told Dorsey and McConnell that she had not sent the crew to her house, that she did not supervise underground crews and did not have the authority to direct the installation. (Pl. 56.1 ¶ 11; Pl. Dep. 37:22–38:14.) Plaintiff told them that Carlon had arranged for the installation of the underground lines. (Def. 56.1 ¶ 13; Pl. 56.1 ¶ 13.) At the end of the meeting, Plaintiff told Dorsey and McConnell that she had thought she was being called into the meeting to discuss Delach's conduct toward her, but the investigators did not respond to this statement. (Pl. 56.1 ¶ 10; Pl. Dep. 42:4–43:5, 52:8–24; Setelius Aff. ¶ 12.)

Dorsey and McConnell subsequently questioned Carlon who denied having any involvement in the installation of the underground power lines in Plaintiff's home. (Dorsey Aff. ¶ 13.) Carlon initially stated that he had not had any discussions with Plaintiff regarding any electrical work at her house, but subsequently recalled that "he did discuss with her the idea of going to underground service, [and] said sure why not go to underground service."[5] (Investigation Notes at 4.) Carlon told Dorsey and McConnell that he did not send a crew to Plaintiff's house or street, and that Plaintiff had access to the independent contractor crews and could divert them. (*Id.*) Carlon also acknowledged that "we do things for employees all the time," but that "no other employee ha[d] come to him to initiate an underground service." (*Id.*) In a subsequent section titled "Observations," the author of the Investigation Notes wrote that "Carlon acknowledged that there are certain types of work that is done for employees at their request, perhaps quicker th[a]n it would happen for a customer — transformer replacement, leaning pole, service line relocation." (*Id.* at 7.)

---

[5] The notes state: "[Plaintiff] was having work done at her house and that's why the discussion took place. [Carlon] has underground service and [Plaintiff] has been to [Carlon's] house in Levittown." (Dorsey Investigation Notes 4.)

Dorsey and McConnell interviewed Plaintiff again in August 2010, during which interview Plaintiff stated that other National Grid employees had underground electrical service installed at their homes.  (Dorsey Aff. ¶ 11.)  According to Plaintiff, when she "asked if Human Resources spoke with Carlon, who [Plaintiff] had previously indicated had suggested [Plaintiff] have the lines installed at his own home," Plaintiff was told that "Carlon said [Plaintiff] was 'a liar.'"  (Setelius Aff. ¶ 13.)  According to the Investigation Notes, Plaintiff said that she was "99% certain that it was Asplundh [a National Grid contractor] who did the work since they are the only contractor who does this type of work for us," but that she was not present for the work, did not sign any paperwork, and did not direct a crew to perform the work.  (Investigation Notes 5.)  Plaintiff again stated that she had a conversation with Carlon about underground service, and that Carlon mentioned that he could get the work done "if someone was going to be over in the area."  (*Id.*)  Plaintiff believed that when the work was completed she thanked Carlon, that she anticipated getting a bill for the work at some point, and that the underground wiring had never been connected to the home, or "energized."  (*Id.* at 5–6.)  The "Observations" section of the Investigation Notes concluded "[t]he work order process was circumvented; an employee derived a benefit at no cost wherein such benefit is available to the public but only at a cost." (*Id.* at 6.)

### f.    Installation of underground power lines at co-worker's home

According to Plaintiff, during her August 2010 conversation with Dorsey and McConnell, she named Carlon as an employee that Plaintiff was aware had underground lines installed at his home, but was not able to name any other such employees.  (Setelius Dep. 56:21– 57:6.)  According to Dorsey, Plaintiff "refused to provide" the names of any National Grid employee who also had underground electrical service installed at their homes.  (Dorsey Aff. ¶¶

14–15.)  As a result, Dorsey and McConnell conducted "spot checks of other management employees who were peers" of Plaintiff, but were unable to substantiate Plaintiff's allegations. (Def. 56.1 ¶¶ 17–18; Dorsey Aff. ¶ 15.)  According to the deposition testimony of Richard Romano,[6] when Dorsey and McConnell provided him with an update regarding the investigation in late 2010 or early 2011, Romano learned that Carlon was investigated because he had an underground electrical service at his home, and "he was referred to somewhere in the investigation" of Plaintiff.  (Deposition of Richard Romano, annexed to Setelius Aff. as Ex. 3 ("Romano Dep.") 20:3–23.)  According to Dorsey, during the course of the investigation "it came to [their] attention that another employee, Albert Carlon, also had an underground electrical service at his residence."  (Reply Affidavit of Christopher Dorsey, annexed to Def. Notice of Motion at Docket Entry No. 41 ("Dorsey Reply Aff.") ¶ 3.)  National Grid commenced an investigation in or about late 2010 to determine whether Carlon had violated National Grid ethics policy.  (*Id.* ¶ 4.)  The investigation revealed that Carlon had two separate underground electrical services installed at his residence, one that supplied electricity to the main house, and a separate one that supplied a "cabana" on the property.  (*Id.* ¶ 5.)  Carlon admitted to internal investigators that he had an underground electrical service installed at his residence, but stated that no National Grid crews or contractors were used to install either of the services, and that he had installed the underground service himself with a personal friend and family member.  (*Id.* ¶ 7.)  Carlon explained that "he had used a private electrician not affiliated with the Company to install the underground service to the cabana."  (*Id.*)  The National Grid investigation "did not reveal any records or information to dispute Mr. Carlon's explanation regarding the manner in

---

[6] Romano was the "electrical business partner" representative to the human resources department for National Grid at the time.  (Romano Dep. at 7:3–16.)

which the underground services at his residence were installed." (*Id.* ¶¶ 7–8.) As a result of their investigation, National Grid concluded that Carlon had not violated any company ethics policies. (*Id.* ¶ 9.)

### g. Plaintiff's termination

As a result of their investigation into Plaintiff, Dorsey and McConnell concluded that Plaintiff had violated the company's Standards of Conduct by using a National Grid contractor to install an underground electrical service at her home without paying for the installation. (Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19; Dorsey Aff. ¶ 16.) Dorsey and McConnell advised Thomas Beisner, the Director of Electrical Service for National Grid, and Richard Romano of their conclusion. (Def. 56.1 ¶ 20; Pl. 56.1 ¶ 20; Dorsey Aff. ¶ 16.) Beisner and Romano determined that Plaintiff's conduct constituted a serious violation of the company's Standards of Conduct. (Def. 56.1 ¶ 21; Pl. 56.1 ¶ 21.) Beisner and Romano met with Plaintiff on February 10, 2011, and terminated her employment. (Def. 56.1 ¶ 22; Pl. 56.1 ¶ 22.) At the time of her termination, Plaintiff was earning an annual base salary of $91,960. (Def. 56.1 ¶ 43; Pl. 56.1 ¶ 43.)

## II. Discussion

### a. Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic Sec., L.L.C.*, 558 F. App'x 89, 89 (2d Cir. 2014); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

*Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.*  The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party."  *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).  The Second Circuit has cautioned that '[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'"  *Taddeo v. L.M. Berry & Co.*, 526 F. App'x 121, 122 (2d Cir. 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).

### b.  Discrimination claims against National Grid — Title VII and NYSHRL

Plaintiff claims that National Grid discriminated against her on the basis of gender in violation of Title VII and the NYSHRL.[7]  (Compl. ¶¶ 43, 45.)  Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  Thus, "[a]n employment decision . . . violates Title VII when it is 'based in whole or in part on discrimination.'"  *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (quoting *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)).

---

[7]  Plaintiff's claim of individual liability against Delach pursuant to the NYSHRL is analyzed *infra* in section II.f.

Title VII discrimination claims are assessed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[8] *See e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253–55 (1981); *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (applying burden shifting framework to gender discrimination claim). Under the framework, a plaintiff must first establish a *prima facie* case of discrimination. *Hicks*, 509 U.S. at 506; *see also Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 11 (2d Cir. 2013); *Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010). The plaintiff's burden at this stage is "minimal." *Holcomb*, 521 F.3d at 139 (quoting *Hicks*, 509 U.S. at 506). If the plaintiff satisfies this initial burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Hicks*, 509 U.S. at 506–07; *Ruiz*, 609 F.3d at 492. The defendant's burden "is not a particularly steep hurdle." *Hyek v. Field Support Servs.*, 702 F. Supp. 84, 93 (E.D.N.Y. 2010). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509). "If the employer is able to satisfy that burden, the inquiry then returns to the plaintiff, to demonstrate that the proffered reason is a pretext for discrimination." *United States v. City of New York*, 717 F.3d 72, 102 (2d Cir. 2013). To defeat summary judgment at this stage, "a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d

---

[8] The burden of proof and production for employment discrimination claims under Title VII and the NYSHRL are identical. *Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60 (2d Cir. 2012) ("Claims brought under the NYSHRL 'are analyzed identically' and 'the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII.'" (alteration in original) (quoting *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999))). Therefore, Plaintiff's Title VII and NYSHRL discrimination claims are analyzed together for purposes of this motion.

134, 156 (2d Cir. 2010); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S.

Ct. 2517, 2522–23 (2013) ("An employee who alleges status-based discrimination under Title

VII . . . [must] show that the motive to discriminate was one of the employer's motives, even if

the employer also had other, lawful motives that were causative in the employer's decision.").

### i. *Prima Facie* Case

To establish a *prima facie* case of gender discrimination under Title VII, a plaintiff must

show that: "(1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he

held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment

action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown*

*v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Mills v. S. Conn. State Univ.*, 519

F. App'x 73, 75 (2d Cir. 2013); *Ruiz*, 609 F.3d at 491–92. National Grid does not dispute that

Plaintiff is a member of a protected class as a woman, or that her termination is an adverse

employment action. (*See* Def. Mem. 6.) The parties dispute whether other employment actions

complained of by Plaintiff are adverse employment actions, and whether Plaintiff's termination

occurred under circumstances giving rise to an inference of discrimination.

### 1. Adverse employment action

Plaintiff argues that, in addition to her termination, "the totality of [other] actions [by

National Grid] combine to create an atmosphere of adverse action." (Pl. Opp'n Mem. 10.)

National Grid argues that Plaintiff has not met her burden to show that the minor incidents cited

by Plaintiff comprise an adverse employment action when viewed together. (Def. Reply 7–8.)

The Second Circuit has made clear that "[a]n adverse employment action is a materially

adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d

70, 78 (2d Cir. 2008). Such action must be "more disruptive than a mere inconvenience or an

alteration of job responsibilities." *Brown*, 673 F.3d at 150 (quoting *Joseph v. Leavitt*, 465 F.3d

87, 90 (2d Cir. 2006)). "Examples of materially adverse employment actions include termination

of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title,

a material loss of benefits, significantly diminished material responsibilities, or other indices

unique to a particular situation." *Feingold*, 366 F.3d at 152 (alteration, citation and internal

quotation marks omitted).

      The question of whether a plaintiff may aggregate seemingly minor incidents to show an

adverse employment action for a Title VII claim has not been addressed by the Second Circuit.[9]

However, even assuming that the Court can consider the aggregate of individually non-adverse

---

[9] This Court has noted that "[i]t is not clear whether state and federal antidiscrimination laws permit the Court to aggregate individual discrete acts to attempt to satisfy the 'adverse employment action' prong of Plaintiff's *prima facie* case." *Bowen-Hooks v. City of New York*, --- F. Supp. 2d ---, ---, 2014 WL 1330941, at *18 n.20 (E.D.N.Y. Mar. 31, 2014). Some courts have expressly rejected this approach. *See Kaur v. N.Y.C. Health & Hospitals Corp.*, 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010) ("It should also be noted that there is no authority for the proposition that this Court should consider the cumulative effect of individually alleged adverse employment actions when evaluating Plaintiff's discrimination claim."); *Figueroa v. New York Health & Hospitals Corp.*, 500 F. Supp. 2d 224, 230 (S.D.N.Y. 2007) ("Plaintiff cites no case law, and this Court is aware of none, which supports the proposition that we are to consider the cumulative effect of individually alleged adverse employment actions when evaluating an intentional discrimination claim, as plaintiff alleges here."); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 356 (S.D.N.Y. 2006) ("Although . . . Title VII hostile work environment claims and retaliation claims involve different findings regarding adverse employment actions, the Plaintiff cites no law, and the Court is aware of none, that supports the proposition that the Court can consider the cumulative effect of non-adverse employment actions when evaluating an intentional discrimination claim.").

      In an unpublished summary order, the Second Circuit has suggested that such an argument is cognizable under Title VII. *See Cunningham v. N.Y.S. Dep't of Labor*, 326 F. App'x 617, 619 (2d Cir. 2009) (addressing a "litany of actions" including "unfounded charges of time abuse," reassignment of offices, discontinuing a training conference organized by plaintiff, and excluding plaintiff from a conference and a hiring decision that, "according to plaintiff, constitute adverse employment action when 'considered in their totality,'" and finding that "plaintiffs allegations are — each and together — nothing more than everyday workplace grievances" and not an adverse employment action for purposes of employment discrimination claim (citing *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000))).

actions in determining whether Plaintiff suffered an adverse employment action for purposes of her Title VII or her NYSHRL claim, the aggregate of the actions alleged by Plaintiff do not amount to a materially adverse employment action.

Plaintiff argues that the following actions, when considered collectively, comprise a materially adverse employment action for purposes of her gender discrimination claim: (1) the ostracizing of Plaintiff by Delach, (2) Delach's excluding Plaintiff from meetings, (3) Delach assigning Plaintiff to clerical duties, and (4) Delach criticizing Plaintiff for attending medical appointments. (Pl. Opp'n Mem. 10.) The Court also considers Delach's yelling at Plaintiff and his "criticiz[ing], belittl[ing] and nitpick[ing] minor details" about Plaintiff's work "on a near daily basis," which were asserted by Plaintiff in her Affidavit but not addressed by Plaintiff in her opposition brief. (Setelius Aff. ¶¶ 7–9.)

These actions, even when considered in the aggregate, lack the requisite level of material impact required to establish an adverse employment action for purposes of a gender discrimination claim. Plaintiff has not pointed to evidence of any material impact of these actions, such as evidence that that she suffered a loss of prestige, an impact to her reputation, the loss of an opportunity for a promotion, negative evaluations that affected or could have affected opportunities to receive raises or promotions, or any action equivalent to a demotion or a material increase in her workload.[10] *See Bowen-Hooks*, --- F. Supp. 2d at ---, 2014 WL 1330941, at *24 ("Plaintiff speculates about how various actions *could have* affected her career. However, she has not presented any evidence that it actually did so, such as showing that she applied for and was denied a promotion to the next level in her department, or that, other than having to

---

[10] Although Plaintiff asserts that Delach suggested that she apply for a position that would have been the equivalent of a demotion, (Setelius Aff. ¶ 9), she does not assert that she was in fact demoted.

complete occasional undesirable tasks, she experienced some action equivalent to a demotion, or a material increase in her work load."); *cf. Bass*, 256 F.3d at 1118 (plaintiff who "was not given the same duties as the other Training Instructors . . . , given no routine work assignments and was forced to perform custodial and clerical duties under the supervision of less senior personnel, . . . denied . . . the opportunity to earn overtime pay, on-call pay, riding-out-of classification pay, and adjunct teaching pay, which were available to other Training Instructors. . . . [and] ordered to take tests to maintain his paramedic pay while none of the other Training Instructors were required to do so" experienced adverse employment action for purposes of a pre-*Burlington* retaliation claim when these actions were considered collectively), *overruled in part on other grounds by Burlington Northern*, 548 U.S. at 68. While Plaintiff asserts that her exclusion from meetings resulted in "not [being] made aware of important safety information necessary to perform my job functions," (Setelius Aff. ¶ 3), Plaintiff has not elaborated on how this missing information affected her job, if at all. Similarly, while Plaintiff argues that her application for a work coordinator position was denied in 2009, she concedes that the word coordinator position would have been a demotion rather than a promotion and, in any event, that the position was eliminated before it was filled. (Pl. Opp'n Mem. 4.)

Plaintiff relies on retaliation cases that have articulated a more inclusive standard for determining whether an employment action is "adverse." (Pl. Opp'n Mem. 10–11 ("An accumulation of 'seemingly minor incidents' may combine to establish an 'atmosphere of adverse employment action.'" (quoting *Wallace v. Suffolk Cnty. Police Dep't*, 396 F. Supp. 2d 251, 259 (E.D.N.Y. 2005) and *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002))).) However, *Phillips* and *Wallace* addressed First Amendment retaliation claims, and the standard for establishing an adverse action in a First Amendment retaliation claim is more inclusive than the

standard of "materially adverse change in the terms and conditions of employment" which is required in Title VII discrimination claims.[11]  In *Phillips*, the Second Circuit held that "a combination of seemingly minor incidents [may] form the basis of a constitutional retaliation claim once they reach a critical mass."  *Phillips*, 278 F.3d at 109; *see also Wallace*, 396 F. Supp. 2d at 259 ("[A]n accumulation of 'seemingly minor incidents' may combine to establish an 'atmosphere of adverse employment action,' sufficient to allege a [First Amendment] retaliation claim." (quoting *Phillips*, 278 F.3d at 109)).  Because these cases were decided under the more inclusive standard of First Amendment retaliation,[12] the Court declines to apply their "atmosphere" theory to Plaintiff's claim of discrimination.[13]

---

[11]  "In the context of a First Amendment retaliation claim," the Second Circuit has long "held that 'only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action.'" *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004) (quoting *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001).  This standard is different from the "materially adverse change in the terms and conditions of employment" that is required to establish an adverse action pursuant to Title VII, of discrimination and, until 2006, retaliation.  *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006) (noting that the Second Circuit "has never held that a public employee plaintiff alleging retaliation in violation of the First Amendment must demonstrate a material change in employment terms or conditions").

[12]  Although the district court in *Wallace* was addressing a First Amendment retaliation claim, it articulated the standard that applied to Title VII discrimination claims at that time.  *See Wallace v. Suffolk Cnty. Police Dep't*, 396 F. Supp. 2d 251, 259 (E.D.N.Y. 2005) ("Plaintiff must allege that he experienced a 'materially adverse change in the terms and conditions of employment.'" (quoting *Galabya*, 202 F.3d at 640)).  The court cited the portion of *Galabaya* that addressed a discrimination claim under the Age Discrimination in Employment Act, which, like Title VII, requires a showing of a materially adverse change in the terms and conditions of employment.  However, the Court in *Wallace* also stated, and ultimately applied, the principle that "an accumulation of 'seemingly minor incidents' may combine to establish an 'atmosphere of adverse employment action,' sufficient to allege a retaliation claim," a principle that was established in the context of a First Amendment claim.  *Wallace*, 396 F. Supp. 2d at 259 (quoting *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002)).

[13]  Plaintiff points to several district court decisions that have applied the "atmosphere" theory of adverse employment action articulated by *Phillips* to Title VII retaliation claims that

While National Grid's actions may have contributed to an unpleasant work environment, absent a connection to a material loss in pay, promotion, opportunity, prestige, reputation or workplace accomplishments, or some similar actions, these actions, even viewed collectively, are insufficient to comprise a materially adverse employment action. Therefore, Plaintiff's only adverse employment action is the termination of her employment.

## 2. Inference of Discrimination

Plaintiff argues that an inference of discrimination can be drawn because the investigation National Grid conducted into the installation of the underground electrical wires at Plaintiff's residence "was a sham," with several inconsistencies, and because National Grid treated Plaintiff differently, as compared to similarly-situated male co-workers, by terminating her for installing the underground electrical service. (Pl. Opp'n Mem. 14–15.) National Grid argues that Plaintiff cannot raise an inference of discrimination with respect to her termination, as National Grid terminated Plaintiff "because it reasonably believed that she had violated the Company's Standards of Conduct." (Def. Mem. 7.)

---

were decided prior to *Burlington Northern*, when the standard for retaliation was the same as the standard for discrimination, as well as to Title VII discrimination claims, notwithstanding the more stringent standards applicable to those claims. (*See* Pl. Opp'n Mem. 11 (citing, *inter alia*, *Rooney v. Brown Grp. Retail, Inc.*, No. 08-CV-484, 2011 WL 1303361, at *15 (E.D.N.Y. Mar. 31, 2011) (applying atmosphere theory to Title VII discrimination and retaliation claims) and *Early v. Wyeth Pharm., Inc.*, 603 F. Supp. 2d 556, 574 (S.D.N.Y. 2009) (assuming but not deciding that atmosphere theory applied to the plaintiff's claims of discrimination and retaliation brought pursuant to New York State Human Rights Law law and 42 U.S.C. § 1981 (applying Title VII standards)). Plaintiff also points to non-binding authority from two other Circuit Courts of Appeal that have considered the cumulative effect of multiple actions in determining whether a plaintiff experienced an adverse employment action. (*Id*. at 12 (citing *Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla.*, 256 F.3d 1095, 1118–19 (11th Cir. 2001) (Title VII) and *Phillips v. Collings*, 256 F.3d 843, 849 (8th Cir. 2001) (Section 1983)).) As discussed *infra*, even assuming that the Court were to consider the cumulative effect of individually non-adverse actions, Plaintiff nevertheless cannot establish a materially adverse action.

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'" *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). "No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination." *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (citations omitted). An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (citation omitted), or by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group," *Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 20 (2d Cir. 2013) (quoting *Ruiz*, 609 F.3d at 493).

Contrary to National Grid's claim, Plaintiff is not required to establish that National Grid lacked a legitimate reason for terminating her in order to raise an inference of discrimination. *See Graham v. Long Island R.R.*, 230 F.3d 34, 41–42 (2d Cir. 2000) (finding "it was premature [for the district court] to consider [the defendant's] evidence" at the *prima facie* stage, since the "burden at this stage of the *McDonnell Douglas* analysis rests solely on" the plaintiff, and noting that "only [the plaintiff's] evidence should be considered when deciding whether plaintiff has met [her] initial burden"). Plaintiff only needs to produce evidence tending to show that her termination occurred under circumstances giving rise to an inference of discrimination. *See Holcomb*, 521 F.3d at 138 ("A plaintiff satisfies [her] burden [at the *prima facie* stage] if he or

she introduces evidence that raises a reasonable inference that the action taken by the employer was based on an impermissible factor [by showing, *inter alia*] . . . that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."). Plaintiff attempts to do so by arguing that (1) the inconsistencies in the investigation leading to Plaintiff's termination raise an inference of discrimination, and (2) she was treated differently from a similarly situated co-worker.  (Pl. Opp'n Mem. 14–15.)

### A.  Investigation inconsistencies

Plaintiff argues that National Grid's discriminatory intent in terminating her is "demonstrated by the fact that the investigation it conducted in connection with the installation of the underground electrical wires at [Plaintiff's] residence was a sham."  (Pl. Opp'n Mem. 15.) Plaintiff specifically cites the following inconsistencies in the investigation, (1) the fact that Carlon admitted to investigators that "some sort of discussion" had taken place between himself and Plaintiff regarding underground electrical service, but that the investigators told Plaintiff that Carlon "said she was lying about ever having discussed the underground electrical wires with him," (*id*.), (2) the fact that the investigation was commenced one year after the underground electrical service was installed, and took six months to conclude, was "suspect,"  (*id*. at 16), and (3) the fact that one of the National Grid investigators provided a sworn statement indicating that Plaintiff had not provided the names of other employees who also had underground service installed at their homes, but that another National Grid employee suggested in his deposition that Plaintiff had identified Carlon as one such employee, (*id*. at 15).  National Grid argues that Plaintiff's "subjective view that the investigation should have been conducted differently is not

sufficient to defeat summary judgment."[14]  (Def. Reply Mem. 6 (citing *Mendez-Nouel v. Gucci Am., Inc.*, No. 10-CV-3388, 2012 WL 5451189, at \*15 (S.D.N.Y. Nov. 8, 2012), *aff'd*, 542 F. App'x 12 (2d Cir. 2013)).)

Plaintiff's argument about the deficiency of National Grid's investigation into the underground electrical service at her home is not sufficient to raise even a minimal inference of discrimination.  Plaintiff asserts that Carlon "said she was lying about ever having discussed the underground electrical wires with him," which, according to Plaintiff's memorandum of law, contradicted the Investigation Notes where Carlon admitted that there was "some sort of discussion," between Carlon and Plaintiff.  (Pl. Opp'n Mem. 15 (citing Investigation Notes and Setelius Aff. ¶ 13).)  However, Plaintiff's affidavit statement only asserts that the investigators told Plaintiff that Carlon "said I was 'a liar.'"  (Setelius Aff. ¶ 13.)  It does not state that the investigators told Plaintiff that Carlon asserted that Plaintiff was lying "about ever having discussed the underground electrical wires with him."  Carlon's alleged statement that Plaintiff was "a liar" is not  inconsistent with the Investigation Notes documenting that Carlon denied having "initiated the underground service process" for Plaintiff.  (*See* Investigation Notes 4.)

Plaintiff's remaining arguments rely on minor factual discrepancies within the investigation that are immaterial and lack any evidentiary basis to plausibly be explained by discrimination.  Plaintiff argues for example that Dorsey, in his initial affidavit, stated that Plaintiff "refused to identify any other company employee who allegedly used a Company contractor to install an underground electrical service and his/her personal residence," but that Romano stated during his deposition that Plaintiff "told the investigators about Carlon's

---

[14]  It is not clear from Defendants' brief whether they address this argument to the "inference of discrimination" element or the element of "pretext," but the Court assumes Defendants address it to both.

underground installation," and that a jury could infer a discriminatory motive from this inconsistency. (Pl. Opp'n Mem. 15 (citing Romano Dep. 21).) Even assuming that Romano testified that Plaintiff told the investigators about Carlon, but Dorsey presented a sworn statement to the contrary, it is unclear how the fact that National Grid incorrectly stated that Plaintiff did not identify any other employees by name supports the conclusion that National Grid had a discriminatory motive for terminating Plaintiff. There is no evidence that Plaintiff's refusal to name other employees was one reason for her termination, and Plaintiff has not made such a claim. A factual inconsistency in National Grid's description of its investigation which factual discrepancy is not material to National Grid's decision to terminate Plaintiff does not support an inference of discrimination.

Plaintiff also asserts that the "timing of the investigation is suspect," in that it was commenced more than one year after the work was completed and the investigation took six months to complete. (Pl. Opp'n Mem. 16.) In fact, the Investigation Notes submitted by Plaintiff show that the investigation was commenced in May 2009, the same month that the underground electrical service was installed at Plaintiff's residence, and that there were three investigatory site visits made to Plaintiff's residence by the Revenue Protection department between July 2009 and February 2010. (Investigation Notes 1.) As for the length of time that the investigation took to complete, it is unclear how this fact creates an inference that National Grid was motivated by impermissible discriminatory animus.

Absent any evidence that National Grid's decision to terminate Plaintiff was motivated by her gender, the minor inconsistencies in the investigation are insufficient to establish that Plaintiff's termination took place under circumstances giving rise to an inference of discrimination. *See McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 216 (2d Cir.

2006) ("McPherson is attacking the *reliability* of the evidence supporting DOE's conclusions. In a discrimination case, however, we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what '*motivated* the employer.'" (quoting *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) (emphasis in *McPherson*))); *see also Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 997 (8th Cir. 2011) ("[S]hortcomings in an investigation do not by themselves support an inference of discrimination."); *Jones v. Gen. Bd. of Global Ministries of United Methodist Church*, No. 96-CV-5462, 1997 WL 458790, at *2 (S.D.N.Y. Aug. 11, 1997) (finding that plaintiff's criticism of "the validity of the investigation conducted by [her employer] and the credibility of the witnesses upon whom [the employer] relied . . . may prove that the investigation was poorly conducted, . . . [but] it does not raise an inference of discrimination based on race or sex").

Plaintiff has offered no evidence to show that any of the decision-makers involved in her investigation and termination had any gender-based discriminatory motivation. Rather, all of Plaintiff's proffered evidence of gender-based discrimination focuses on the conduct of Delach, who undisputedly played no role in the decision to initiate the investigation into Plaintiff's purported misconduct or to terminate her. (Def. 56.1 ¶ 23; Pl. 56.1 ¶ 23; Delach Decl. ¶¶ 14–15; Dorsey Decl. ¶ 23; Beisner Decl. ¶ 10).) Under these circumstances, in the absence of any evidence to support Plaintiff's claim that the decision to terminate her was motivated by gender discrimination, the minor inconsistencies in the investigation are insufficient to establish an inference of discrimination. *See Wolf v. Time Warner, Inc.*, 548 F. App'x. 693, 695 (2d Cir. 2013) (affirming summary judgment for defendant and noting that "while Wolf's claim stems in large part from a comment about her age made by her colleague Harry Spencer in 2005, Wolf has presented little, if any, evidence of [discriminatory] animus on the part of . . . Wolf's

supervisors who fired her in 2007"); *cf. Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009) (holding that "where a plaintiff can point to evidence closely tied to the adverse employment action that could reasonably be interpreted as indicating that discrimination drove the decision, an arguably insufficient investigation may support an inference of discriminatory intent").

### B. Differential treatment

Plaintiff argues that Carlon engaged in comparable conduct but was not disciplined in any manner, raising an inference of discrimination. (Pl. Opp'n Mem. 14; Setelius Aff. ¶ 20k.)

An inference of discrimination can be raised by showing that (1) a plaintiff was similarly situated to other employees outside her protected group, and (2) she was treated less favorably than those employees. *Ruiz*, 609 F.3d at 493 ("A showing of disparate treatment — that is, a showing that an employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group' — is a recognized method of raising an inference of discrimination for the purposes of making out a *prima facie* case."); *Sethi v. Narod*, --- F. Supp. 2d ---, ---, 2014 WL 1343069, at *21 (E.D.N.Y. Apr. 2, 2014) (same); *John v. Kingsbrook Jewish Med. Ctr./Rutland Nursing Home*, No. 11-CV-3624, 2014 WL 1236804, at *9 (E.D.N.Y. Mar. 25, 2014) (same); *Batchelor v. City of New York*, --- F. Supp. 2d ---, ---, 2014 WL 1338299, at *14 (E.D.N.Y. Apr. 1, 2014) (same); *Shlafer v. Wackenhut Corp.*, 837 F. Supp. 2d 20, 25 (D. Conn. 2011) ("Discriminatory motivation may be established by allegations of preferential treatment given to similarly situated individuals . . . ." (citations omitted)). To raise an inference of discrimination in this manner, a plaintiff must show that "she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quoting *Graham*, 230 F.3d at 39).

A plaintiff can show that she was "similarly situated" to other employees by showing that they were "(1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Abdul-Hakeem*, 523 F. App'x at 21 (quoting *Ruiz*, 609 F.3d at 493–94 (internal quotation marks omitted)). Where the argument of disparate treatment is based on disparate enforcement of company policy, a plaintiff must show that "similarly situated employees who went undisciplined engaged in comparable conduct." *Graham*, 230 F.3d at 40. The conduct in question must be of "comparable seriousness," *id.* (quoting *McDonnell Douglas*, 411 U.S. at 804), but does not require a showing "that employees engage[d] in the exact same offense." *Id.* (citation and quotation marks omitted). In addition, "[t]he determination that two acts are of comparable seriousness requires . . . an examination of the context and surrounding circumstances in which those acts are evaluated." *Id.* "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 54 (2d Cir. 2014) (quoting *Graham*, 230 F.3d at 39).

It is undisputed that Carlon and Plaintiff were subject to the same discipline standards, as National Grid "requires all employees to observe 'the highest standards of business conduct,' to avoid situations that create 'even the appearance of impropriety,' to 'use their position, [and the] opportunities discovered through their position, and company resources only for company purposes and not for personal gain,'" and to "protect company resources [they] work with or are responsible for."[15] (Def. 56.1 ¶ 5; Pl. 56.1 ¶ 5 (quoting Standards of Conduct).)

---

[15] Although Carlon as a work coordinator, and Plaintiff as a field supervisor had different titles, this difference is not material to the similarly-situated analysis, as there is no evidence that the Standards of Conduct did not apply equally to work coordinators and field supervisors. *See Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 184 (E.D.N.Y. 2013) (noting that plaintiff and comparator were similarly situated with respect to conduct that violated the employer's disciplinary standards, despite having different titles where, "[b]y its terms, the

Plaintiff argues that Carlon engaged in comparable conduct to her by facilitating the installation of the underground electrical service at Plaintiff's home.[16] (Pl. Opp'n Mem. 14–15.) National Grid argues that Carlon did not engage in comparable conduct, because National Grid conducted an investigation into whether Carlon violated the company Standards of Conduct and concluded that Carlon had not violated the company Standards of Conduct, because he did not use a National Grid contractor to install the underground service at his home. (Def. Reply 5–7 and n.4; Dorsey Reply Aff. ¶ 4.) They also note that Carlon "denied any involvement in the installation of [Plaintiff's] underground service, and there was no independent evidence to substantiate [Plaintiff's] claim that he did." (Def. Reply 7.)

National Grid cannot rebut the assertion that Plaintiff and Carlon, the proposed comparator, are similarly situated merely by its subjective conclusions based on an internal

---

Sexual Harassment Policy applies to all employees, and Defendant has not argued, nor is there any evidence to suggest, that the policy was applied more stringently to MRI technicians than registered nurses" (citing cases)); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 42 (2d Cir. 2000) (noting that plaintiff and two comparators were similarly situated and had engaged in comparable conduct by violating company policy, despite having different positions, where "[n]owhere does the policy refer to the position held by the employee").

[16] At oral argument counsel for Plaintiff conceded that National Grid's investigation and conclusion that Carlon had not used company resources to install an underground electrical service at his home prevented Plaintiff from establishing that Carlon engaged in comparable conduct to her in this respect, for purposes of establishing an inference of discrimination. Plaintiff claims that Carlon had underground service installed at his residence, but Plaintiff admits that she has no personal knowledge as to whether Carlon used a National Grid contractor and resources to install this service. (*See* Compl. ¶¶ 39–40; Pl. Dep. 56:5–58:8.) Indeed, there is insufficient evidence in the record from which a jury could find that Carlon engaged in comparable conduct with respect to the installation of an underground electrical service at his own residence. Plaintiff admitted that she had not paid for this benefit, and that she was "99% certain" that a National Grid contractor had done the installation. (Def. 56.1 ¶ 12; Pl. 56.1 ¶12; Investigation Notes 5.) This was not a subjective determination by National Grid, but Plaintiff's own statement. In contrast, there is no evidence in the record that Carlon similarly used a National Grid contractor for the installation of the underground service at his own residence; Carlon denied that he did. Accordingly, Plaintiff cannot show that Carlon engaged in comparable conduct with respect to the installation of underground electrical service at his own residence.

investigation. *See Graham*, 230 F.3d at 40 (noting that, in determining whether a plaintiff and a comparator are similarly situated, "there should be an *objectively* identifiable basis for comparability" (emphasis added) (citation and internal quotation marks omitted)). Here, in light of the factual dispute over whether Carlon played a role in the installation of the underground electrical service, National Grid's conclusion is not a substitute for a jury determination of whether Plaintiff and her proposed comparator were similarly situated. *See Temple v. City of New York*, No. 06-CV-2162, 2010 WL 3824116, at *8 (E.D.N.Y. Sept. 23, 2010) (noting that while the plaintiff's employer "concluded . . . that Plaintiff's conduct was more egregious than that of her comparators, factual issues concerning comparable conduct such as those presented in this case are appropriately resolved by a jury" for purposes of establishing an inference of discrimination (citing *Graham,* 230 F.3d at 42–43)).

Plaintiff argues that Carlon was similarly situated to her in that he arranged to have the underground electrical service installed at Plaintiff's residence without her paying for it, which arrangement violated National Grid policy. Plaintiff points to the fact that during National Grid's investigation, Carlon initially denied having discussed the underground service with Plaintiff, and then reversed his position during the same conversation and recalled that "he did discuss with [Plaintiff] the idea of going to underground service, [and] said sure why not go to underground service." (*See* Investigation Notes 4.) At oral argument, counsel for Plaintiff argued that this conduct by Carlon would comprise a violation of National Grid Standards of Conduct, and that such violation was of comparable seriousness to Plaintiff's violation in accepting the installation of the underground electrical service at her home. Counsel for National Grid argued that Carlon and Plaintiff did not engage in comparable conduct because it

was not simply the installation of the service in her home that led to Plaintiff's termination, but the fact that Plaintiff did not make any follow-up inquiry with respect to paying for the services.

There are disputed facts as to Carlon's role in the installation of the underground electrical service at Plaintiff's home. Crediting Plaintiff's version of events, if Carlon arranged for a National Grid contractor to perform the work at Plaintiff's home because Plaintiff did not have authority to do so, and subsequently failed to generate a bill for the work, a reasonable jury could find that Carlon's conduct was objectively comparable to Plaintiff's inasmuch as it would have violated National Grid's Standards of Conduct requirement that employees "protect company resources [they] work with or are responsible for." (*See* Standards of Conduct 8.) Even though the conduct for which Plaintiff was terminated included her own ongoing failure to inquire about making a payment for the installation of the underground service, whereas Carlon's alleged misconduct only went as far as failing to generate a bill for the services, the conduct of a proposed comparator need not be identical, but only "sufficiently similar to plaintiff's to support at least a minimal inference that the difference [in treatment] may be attributable" at least in part to discrimination. *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 475 (S.D.N.Y. 2011) (alteration in original) (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001)); *Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 185 (E.D.N.Y. 2013) ("[W]hether Plaintiff's conduct, centering around one violation of Defendant's Sexual Harassment Policy, is more serious than Birmingham's ongoing sexually explicit behavior, is a decision best left for the jury."); *Williams v. Mount Sinai Med. Ctr.*, 859 F. Supp. 2d 625, 641 (S.D.N.Y. 2012) ("Were a jury to find Williams and Buchsbaum similarly situated, it could conclude that the disparate treatment Williams received raises an inference of discrimination.").

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Plaintiff and Carlon engaged in conduct sufficiently similar to render them similar "in all material respects," such that the difference in their conduct raises the minimal inference of discrimination that is required at the *prima facie* stage. *See Graham*, 230 F.3d at 43 ("Whether these employees were similarly situated presented a material question of fact. Were a jury to find that [the plaintiff] was similarly situated to [the proposed comparators], it could conclude that the disparate treatment he received completes a *prima facie* showing of discrimination under Title VII.").

## ii. Nondiscriminatory explanation

Once Plaintiff establishes her *prima facie* case, the burden shifts to National Grid to proffer a nondiscriminatory explanation for her termination. National Grid argues that Plaintiff's violation of the Company's Standards of Conduct was the nondiscriminatory reason for her termination. (Def. Mem. at 13–14.) This satisfies National Grid's burden at this stage. *See Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010) (affirming district court finding that defendant's proffered reason for terminating plaintiff — for violating company policies — was a nondiscriminatory reason); *Walcott v. Cablevision*, No. 10-CV-2602, 2012 WL 4447417, at *10 (E.D.N.Y. Sept. 24, 2012) (finding that the defendant's explanation that the plaintiff was terminated for violating company policy satisfied its burden at this stage of the analysis).

In light of Plaintiff's argument that she was treated differently from a similarly situated individual, National Grid also asserts that the nondiscriminatory reason for its differential treatment between Carlon and Plaintiff with respect to the investigation into the installation of the underground electrical service at Plaintiff's home was the fact that Carlon "denied any involvement in the installation of [Plaintiff's] underground service, and there was no

independent evidence to substantiate [Plaintiff's] claim that he did." (Def. Reply 7.) This is sufficient to meet its burden to proffer a nondiscriminatory reason for the difference in treatment between Plaintiff and Carlon.

### iii. Pretext

Once a defendant has proffered a nondiscriminatory reason for its adverse action, the burden shifts back to the plaintiff to show that this reason is pretextual. *Holcomb*, 521 F.3d at 141. To avoid summary judgment, a plaintiff must offer evidence from which a reasonable jury could conclude by a preponderance of the evidence that discrimination played a role in the adverse action taken by the defendant. *Id.*; *Dall*, 966 F. Supp. 2d at 187. At this stage a plaintiff may "adduce . . . competent evidence to rebut [the defendant's] explanation or show that it is 'unworthy of credence.'" *Deabes v. Gen. Nutrition Corp.*, 415 F. App'x 334, 335 (2d Cir. 2011) (quoting *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1113 (2d Cir. 1988)). However, a "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Holcomb*, 521 F.3d at 138 (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)); *see also Nassar*, 570 U.S. at ---, 133 S.Ct. at 2526; *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013). The burden is on the plaintiff to "point to evidence that reasonably supports a finding of prohibited discrimination." *Wolf v. New York City Dep't of Educ.*, 421 F. App'x 8, 11 (2d Cir. 2011) (quoting *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)); *see also Desir v. City of New York*, 453 F. App'x 30, 34 (2d Cir. 2011) ("In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000))).

Plaintiff contends that a reasonable jury could find that National Grid's proffered reason for terminating her are pretextual based on two reasons: (1) the numerous inconsistencies in the investigation that led to Plaintiff's termination, and (2) the fact that Plaintiff was treated differently from other employees with respect to the conduct that led to her termination. (Pl. Opp'n Mem 15.) As discussed above, the inconsistencies in the investigation are insufficient to meet Plaintiff's minimal burden of raising an inference of discrimination at the prima facie stage; therefore they are also insufficient to meet her burden of showing that this reason was pretext for discrimination.

"[A] showing that similarly situated employees" falling outside the plaintiff's protected class "received more favorable treatment [than the plaintiff] can . . . serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for . . . discrimination." *Adamczyk v. New York Dep't of Corr. Servs.*, 474 F. App'x 23, 27 (2d Cir. 2012) (alteration in original) (quoting *Graham*, 230 F.3d at 43). To demonstrate evidence of pretext in this manner, the plaintiff must show that "she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Iuorno v. DuPont Pharm. Co.*, 129 F. App'x 637, 640 (2d Cir. 2005) (quoting *Graham*, 230 F.3d at 39).

As discussed above, Plaintiff has presented sufficient evidence that a reasonable jury could find that she and Carlon were similarly situated in all material respects. However, Plaintiff has not shown that Defendant's proffered reason for the difference in treatment — the fact that they believed Carlon's denials of playing any role in Plaintiff's installation — is pretext for discrimination. Moreover, even if she could make the case that National Grid should not have credited Carlon's denials and a reasonable jury could find that Plaintiff and Carlon were

similarly situated, there is insufficient evidence in the record to permit a rational inference that Plaintiff's termination was motivated at least in part by discrimination.

### 1. Explanation for differential treatment

While Plaintiff was able to establish a *prima face* case of discrimination based solely on her evidence that National Grid treated her differently from Carlon, who is outside her protected group, she still must show, at this third and final stage of the burden-shifting analysis, that National Grid's proffered reason for their differential treatment is pretext for discrimination. Consequently, the initial focus of the Court's inquiry is the potential motivations of National Grid and the individuals conducting the investigation.

National Grid's proffered reason for their different treatment of Plaintiff and Carlon, with respect to the respective role played by each in the installation of underground electrical service at Plaintiff's home, is the fact that Carlon "denied any involvement in the installation of [Plaintiff's] underground service, and there was no independent evidence to substantiate [Plaintiff's] claim that he did." (Def. Reply 7.) Plaintiff argues that the fact that during his interview with investigators Carlon initially denied having a conversation with Plaintiff about underground electrical service and subsequently recalled the conversation later in the same interview, and the fact that Plaintiff was not in a position to order the work to be done herself suggests that National Grid's proffered reasons are not credible. However, these facts alone are not such persuasive evidence of Carlon's culpability that National Grid's decision to believe Carlon's denial of involvement should be discounted as "unworthy of credence." *See Deabes*, 415 F. App'x at 335.

In other cases where a plaintiff has successfully argued that an employer's articulated reason for different treatment of a comparator who allegedly engaged in similar conduct was simply pretext for discrimination, the plaintiff put forward some evidence that supported the

rational inference that the employer's conclusion was either false or so irrational or arbitrary as to permit an inference of discrimination, or evidence that the conclusion was motivated at least in part by discrimination. *See Temple v. City of New York*, No. 06-CV-2162, 2010 WL 3824116, at *10–11 (E.D.N.Y. Sept. 23, 2010) (finding that defendant's reliance on the school principal's determination that the African-American plaintiff engaged in more egregious misconduct than similarly situated white teachers was not a nondiscriminatory reason for their differential treatment, where the plaintiff put forth evidence that the principal "engaged in a pattern of disparately favoring Caucasian employees at [the school] — *i.e.,* that he routinely overlooked misconduct committed by Caucasian employees, but would not hesitate to formally charge Plaintiff with disciplinary infractions"); *Walker v. New York City Dep't of Corr.*, No. 01-CV-1116, 2008 WL 4974425, at *17 (S.D.N.Y. Nov. 19, 2008) (finding that the plaintiff met her burden to show that employer's explanation for its differential treatment of a similarly situated comparator was pretextual by showing that it was false); *cf. Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("[I]n a predominantly Christian department, [a supervisor's] decision to reject the one known Jewish candidate in favor of a candidate of unknown religion, *coupled with his pro-Christian comments*, could support an inference of discrimination." (emphasis added)); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 46 (2d Cir. 2000) (finding that "[a] claim that a single, supposedly less qualified male received tenure in the hard sciences," while the plaintiff, a female professor, did not receive tenure "does not signify sex bias because the record at best indicates a difference of opinion in evaluation of scholarly merit, and not gender discrimination").

In contrast, Plaintiff does not offer any evidence of discriminatory motivation, not even evidence of implicit bias, by the individuals involved in her investigation and the ultimate

decision to terminate her employment. In the absence of evidence to substantiate the possibility that National Grid's proffered reason for treating Plaintiff differently from Carlon — the fact that they credited Carlon's denial of involvement in the installation of the underground service, while Plaintiff admitted to having the service installed and failed to inquire about billing — is pretext for discrimination, Plaintiff has not met her burden to show that summary judgment should not be granted.

### 2. Explanation for termination

Even assuming, *arguendo*, that Plaintiff could establish that Carlon in fact played a role in the installation of the underground electrical service, in the complete absence of any other evidence in the record to support the rational inference that discrimination was at least in part an explanation for the difference in treatment, Plaintiff still cannot meet her ultimate burden of showing not merely that National Grid's reasons for terminating her were pretextual, but that her termination was motivated, at least in part, by discrimination. Although the Second Circuit in *Graham* found that an employer's differential treatment of a comparator who is similarly situated to a plaintiff but outside the plaintiff's protected group is sufficient evidence from which a reasonable jury could find that the employer's proffered nondiscriminatory reason was pretextual, it did so under circumstances where the plaintiff and his proposed comparators were so similarly situated that it would be rational to draw the inference that the only possible explanation for their difference in treatment was the only way in which the plaintiff and the comparators differed — with respect to their protected status. *See Graham*, 230 F.3d at 43 ("Were a jury to find on these facts that there was disparate treatment in LIRR's disciplining of plaintiff when compared to similarly situated employees," — where plaintiff had been terminated whereas a proposed comparator had only been warned after both committed their second violation of a company policy that expressly provided for automatic dismissal after

second violation — "it could also find that [the employer's] proffer of a non-discriminatory reason for [the plaintiff's] dismissal was pretextual."); *Senno*, 812 F. Supp. 2d at 476 (finding that a reasonable jury could infer a retaliatory motive based on the only evidence offered by plaintiff, defendant's differential treatment of her and a comparator, where "[s]everal of the acts of misconduct with which Plaintiff was charged are identical to acts of misconduct by Dr. Calvi of which the District was aware," and "Plaintiff was subject to 3020–a discipline for filing an incomplete account of his altercation with Dr. Calvi in the school hallway because he failed to describe the full scope of her inappropriate behavior in his report," while "Dr. Calvi was not subject to the same type of disciplinary charges, notwithstanding that she was the one who actually engaged in that inappropriate behavior")  Under the circumstances of these cases, the very close similarity between the plaintiff and his comparators allows the similarly-situated analysis, standing alone, to give rise to a reasonable inference of discrimination.

The Second Circuit has also recognized that a plaintiff and his proposed comparator need not be "identical," but merely sufficiently similar in conduct that a reasonable jury could conclude that the difference in their treatment could rationally be explained, at least in part, by discrimination.  *See Matusick*, 757 F.3d at 54 ("Matusick's evidence of comparators, although not overwhelming, is sufficient for a reasonable jury to have ruled in his favor on this claim.") In *Matusick*, the Second Circuit credited other evidence in the record to conclude that the plaintiff had met her burden of showing sufficient evidence to support a rational inference of discrimination.  *See id.* ("There may not have been anyone at the ECWA who engaged in exactly the same misconduct as did Matusick, but this did not preclude the jury from considering the way that other employees who also engaged in disciplinable on-the-job misconduct were treated, *combined with other indications that ECWA employees held racially discriminatory views*, to

conclude that Matusick was terminated, at least in material part, because of" race.) (emphasis added).

In other words, where the gap in conduct between a plaintiff and a comparator is so small that only one variable, discrimination, can reasonably explain the difference, courts have not required additional circumstantial evidence of discriminatory motivation to allow a plaintiff to meet her burden of showing that a reasonable jury could find that discrimination was more likely than not a reason for her differential treatment. However, where the gap in conduct is large enough that any number of explanations can explain the difference, it is reasonable to expect a plaintiff to put forward some additional evidence — however slight — to tip the scales and make discrimination a more likely explanation than other equally possible nondiscriminatory explanations, such as seniority, favoritism or prior relationships; otherwise, a jury would be required to speculate in order to conclude that the reason for the difference in treatment was discrimination. *See Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 461 (S.D.N.Y. 2006) ("Conway's evidence in support of his discrimination claim consists entirely of his allegations of disparate treatment, assumed for purposes of his prima facie case to raise an inference of discrimination. A close examination of these allegations reveals that Conway's prima facie case is weak at best, and there is no 'additional evidence' offered to show that Microsoft's legitimate reason for demoting Conway" was pretext for discrimination.). Although National Grid's reasons for crediting Carlon's version of events may be mistaken or even patently unfair, so long as those reasons do not include or are not a proxy for gender-based discrimination, there is no basis for a finding of liability under Title VII.

Here, although Plaintiff has put forward evidence sufficient to require the question of whether she and Carlon were similarly situated to be resolved by the jury, even assuming that a

reasonable jury could find that National Grid treated a similarly-situated employee differently, under the circumstances here such a finding, while contributing to Plaintiff's showing that National Grid's real motivations may have included discrimination, is not sufficient to allow a reasonable jury to conclude that discrimination played a role in National Grid's decision. In the absence of any circumstantial evidence of discriminatory animus other than the differential treatment, the inference that the difference in treatment is attributable in part to discrimination would be based on speculation rather than on evidence or a rational inference.

The Court grants National Grid's motion for summary judgment as to Plaintiff's Title VII and NYSHRL discrimination claims.[17]

### c. Retaliation claims against National Grid — Title VII and NYSHRL

Plaintiff claims that National Grid retaliated against her in violation of Title VII and the NYSHRL. (Compl. ¶¶ 43, 45.) Claims of retaliation for engaging in protected conduct under Title VII and NYSHRL are examined under the *McDonnell Douglas* burden shifting test. *See*

---

[17] Plaintiff also argues that "numerous other male employees violated company policies but were not similarly investigated and terminated," and cites several examples, dating back to the mid-1980s, of both named and un-named employees who violated various company policies such as going golfing on company time, accessing pornography on company computers, and billing National Grid for personal shopping expenses, but who were not disciplined. (Pl. Opp'n Mem. 14–15 (citing Setelius Aff. ¶ 19).) At oral argument, counsel for Plaintiff argued that, viewing Plaintiff's conduct more broadly as "misusing company resources," these employees were similarly situated to Plaintiff with respect to their misconduct. The Court is not persuaded that such a broad category of conduct would satisfy the "similarly situated in all material respects" requirements of *Graham*. For purposes of Plaintiff's discrimination claim based on her termination, the only relevant comparison is with respect to the conduct that led to Plaintiff's termination — the installation of the underground electrical service at her home by a National Grid contractor without payment for the service. *See Abdul-Hakeem*, 523 F. App'x at 21 (holding that engagement in comparable conduct is necessary to establish that an employee is similarly situated to co-employees in this context). In any event, there is no admissible evidence in the record substantiating that the alleged misconduct by other National Grid employees occurred, or that it was committed by individuals subject to the same performance evaluation and discipline standards as Plaintiff. Plaintiff has not alleged personal knowledge of any of these alleged infractions.

*Summa v. Hofstra Univ.*, 708 F.3d 111, 125 (2d Cir. 2013) ("The burden-shifting framework laid out in *McDonnell Douglas* . . . governs retaliation claims under both Title VII and the NYSHRL." (citing *McDonnell Douglas*, 411 U.S. at 802)).  Under the test, "[f]irst, the plaintiff must establish a *prima facie* case of retaliation.  If the plaintiff succeeds, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory."  *Fincher*, 604 F.3d 712, 720 (2d Cir. 2010) (citations omitted); *see also Tepperwien v. Entergy Nuclear Operations, Inc*., 663 F.3d 556, 568 n.6 (2d Cir. 2011) (discussing the burden shifting analysis in retaliation context); *Jute v. Hamilton Sundstrand Corp*., 420 F.3d 166, 173 (2d Cir. 2005) (same).  If the employer succeeds at the second stage, the presumption of retaliation dissipates, and the plaintiff must show that, *but for* the protected activity, she would not have been terminated. [18]  *See Nassar*, 570 U.S. at ---, 133 S. Ct. at 2534 (emphasis added) (holding that a plaintiff asserting a Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"); *see also Joseph v. Owens & Minor Distribution, Inc.*, No. 11-CV-5269, 2014 WL 1199578, at *13 (E.D.N.Y. Mar. 24, 2014) (same); *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 454 (E.D.N.Y. 2013) (same); *Ellis v. Century 21 Dep't*

---

[18]  It is unclear whether the Supreme Court decision in *Nassar*, which changed the standard for establishing causation in a retaliation claim from showing that retaliation was a "motivating factor," to showing that it is a "but-for" cause of the adverse employment action, applies to retaliation claims brought pursuant to the NYSHRL.  *See Bowen-Hooks*, --- F. Supp. 2d at ---, 2014 WL 1330941, at *25 n.25 (explaining the absence of binding authority on this issue, and applying but-for standard to plaintiff's retaliation claims under Title VII and NYSHRL).  Since the NYSHRL statutory language is the same, and the New York Court of Appeals has consistently stated that federal Title VII standards are applied in interpreting the NYSHRL, this Court will continue to interpret the standard for retaliation under the NYSHRL in a manner consistent with Title VII jurisprudence, as clarified by the Supreme Court in *Nassar*. *See id.* (collecting cases); *see also Sass v. MTA Bus Co.*, --- F. Supp. 2d ---, ---, 2014 WL 3818663, at *5 (E.D.N.Y. Aug. 4, 2014).

*Stores*, 975 F. Supp. 2d 244, 279 (E.D.N.Y. 2013) (same); *Moore*, 2013 WL 3968748, at *14 (same).

### i. *Prima facie* case

In order to establish a *prima facie* case of retaliation, a plaintiff must establish that "(1) she engaged in protected activity; (2) the employer was aware of this activity; (3) the employee suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)); *see also Summa*, 708 F.3d at 125; *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006). The burden at the summary judgment stage for Plaintiff is "'minimal' and '*de minimis*,'" and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Kwan*, 737 F.3d at 844 (quoting *Jute*, 420 F.3d at 173).

National Grid does not dispute that Plaintiff's termination was an adverse employment action but disputes that Plaintiff engaged in protected activity, that it had knowledge of any such activity, or that there was a causal connection between any protected activity and Plaintiff's termination. (Def. Mem. 14.)

### 1. Protected activity and National Grid's knowledge

Plaintiff argues that she engaged in protected activity by (1) complaining to Zarcone, an area supervisor, about her co-worker Mondello's conduct on an unspecified date, (2) complaining to Dwyer, a supervisor in charge of health and safety, in March 2009 and again in "late 2009" about Delach's mistreatment of her, and (3) complaining to Vice President Hohlman in mid-2009. (Pl. Opp'n Mem. 23.) National Grid contends that Plaintiff's complaints to Dwyer

and Hohlman were not about gender-based discrimination, and that her complaint to Zarcano did not evidence a "good faith, reasonable belief" that the single incident of Mondello yelling at her over the telephone violated Title VII.  (Def. Reply 1–2.)

## A.  Protected Activity

Plaintiff is not required to make a formal complaint about discrimination in order to establish that she engaged in protected activity.  "[T]he law protects employees . . . in the making of informal protests of discrimination, including making complaints to management . . . ." *Summa*, 708 F.3d at 126–127 (quoting *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001)); *see also Amin v. Akzo Nobel Chemicals, Inc.*, 282 F. App'x 958, 961 (2d Cir. 2008) ("Informal complaints to management as to discrimination on a basis prohibited by Title VII are protected activity." (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000))); *Gregory*, 243 F.3d at 700–01 ("The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including making complaints to management, so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." (alteration, citation and internal quotation marks omitted)); *St. Juste v. Metro Plus Health Plan*,  --- F. Supp. 2d ---, ---, 2014 WL 1266306, at *26 (E.D.N.Y. Mar. 28, 2014) ("The complaint can be informal — an employee does not need to lodge a formal complaint of discrimination to engage in protected activity."  (alteration, citation and internal quotation marks omitted) (citing cases)).

However, where an employee claims gender-based discrimination, the employee's informal complaints to management must be gender-based, and not a general complaint about mistreatment by a supervisor or co-worker.  *See Summa*, 708 F.3d at 126 (noting that a plaintiff must establish "that she possessed a good faith, reasonable belief that the [conduct complained of] was unlawful under that statute." (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*,

40

136 F.3d 276, 292 (2d Cir. 1998)); *Rojas v. Roman Catholic Diocese of Rochester,* 660 F.3d 98, 108 (2d Cir. 2011) (noting that "while an employee's complaints about discrimination may be informal, they cannot be so vague or 'generalized' that the employer could not 'reasonably have understood[] that the plaintiff's complaint was directed at conduct prohibited by Title VII." (alteration and citation omitted); *see also Ellis,* 975 F. Supp. 2d at 280 ("When making the complaint, Plaintiff must do so in 'sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of'" the protected status. (quoting *Brummell v. Webster Cent. Sch. Dist.,* No. 06-CV-6437, 2009 WL 232789, at *6 (W.D.N.Y. Jan. 29, 2009))); *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC,* 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) ("ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity").

Plaintiff's complaints to Dwyer, that she was having problems with "the way [she] was being treated," and the "unnecessary yelling," by Delach, and her complaint to Hohlman that she "was having problems with [her] supervisor," never suggested that she believed that this conduct was motivated by her gender, or that she felt targeted because she was a woman. Therefore, the complaints Plaintiff made to these two individuals are not protected activity. *See Rojas*, 660 F.3d at 108 (plaintiff's complaint to her supervisor that her co-worker "is making my life miserable' and 'you need to take action,' meeting with her employer's director of human resources where she 'started to explain . . . about the hostile environment and work conditions in [her] work place' but was interrupted," and email " indicating that [she] wanted to discuss [s]exual [m]isconduct" insufficient for employer to have reasonably understood that she was complaining about sexual harassment); *Batchelor*, --- F. Supp. 2d at ---, (finding that plaintiff did

not engage in protected activity in saying, "That's not fair. That's not the way you do business."); *Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006) (finding the plaintiff's "general allegations of harassment unrelated to" his protected status were "not protected activity under Title VII"), *aff'd*, 629 F.3d 276 (2d Cir. 2010). In addition, counsel for Plaintiff conceded at oral argument that the complaints to Dwyer and Hohlman did not appear to reference gender or Plaintiff's belief that the conduct she complained of was discriminatory.

Plaintiff's complaint to Zarcano, the supervisor of her co-worker Mondello that Mondello screamed and yelled at her over the telephone in an "unprofession[al]" and "abominable" manner referenced Plaintiff's belief that Mondello's conduct was motivated by Plaintiff's gender. Plaintiff told the supervisor that "[i]f I was a man, he wouldn't be yelling at me. He feels he could yell at me because I was a woman." (*See* Pl. Dep. 198:9–10.) This is sufficient to establish that Plaintiff's complaint about her co-worker Mondello's conduct was gender-based.

## B.  National Grid's Knowledge

Plaintiff has also satisfactorily shown that National Grid had general corporate knowledge of this protected activity. Zarcono's knowledge as a supervisor that Plaintiff had complained about her co-worker's conduct is sufficient to establish general corporate knowledge. *See Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011) (finding that plaintiff's complaint to a high-ranking school official was sufficient to establish corporate knowledge); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 362 (S.D.N.Y. 2006) (finding general corporate knowledge where plaintiff's supervisor "admit[ted] knowing that Plaintiff had previously filed a discrimination action"); *Perkins v. Mem'l Sloane-Kettering Cancer Ctr.*, No. 02-CV-6493, 2005 WL 2453078, at *18 (S.D.N.Y. Sept. 30, 2005) (finding general corporate knowledge where plaintiff met with a "Senior Employee Relations Specialist" to discuss her co-worker's alleged harassment); *Taylor v. Lenox Hill Hosp.*, No. 00-CV-3773,

2003 WL 1787118, at *7 (S.D.N.Y. Apr. 3, 2003) *aff'd*, 87 F. App'x 786 (2d Cir. 2004) (finding general corporate knowledge where defendant's benefits coordinator had knowledge of the plaintiff's protected activity, even though "[t]here is no evidence in the record as to whether [the benefits coordinator] ever relayed the conversation to anyone else in the Hospital"). Plaintiff does not have to prove that specific actors knew of the protected activity as long as Plaintiff can demonstrate general corporate knowledge. *See Summa*, 708 F.3d at 125–26 (2d Cir. 2013) ("Nothing more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity," (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000))); *Papelino*., 633 F.3d at 92 ("Even if the agents who carried out the adverse action did not know about the plaintiff's protected activity, the 'knowledge' requirement is met if the legal entity was on notice.").

Thus, while Plaintiff's complaints to Dwyer and Hohlman were not protected activity, because they were not conveyed in a manner that National Grid could reasonably have understood that Plaintiff was complaining about gender-based discrimination or harassment, Plaintiff's complaint to Zarcono, her co-worker Mondello's supervisor, was protected activity.

### 2. Causal connection

Plaintiff argues that a causal connection between her protected activity and her termination can be established based on the fact that National Grid terminated her at the first opportunity following Plaintiff's protected activity. (Pl. Opp'n Mem. 23–24.) National Grid asserts that the individuals who conducted the investigation leading to Plaintiff's termination were not actually aware of any complaints of harassment made by Plaintiff. (Def. Mem. 13.)

"[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski*, 596 F.3d at 110–11 (quoting *Gorman-Bakos v. Cornell*

*Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)); *Kim v. Columbia Univ.*, 460 F. App'x 23, 25 (2d Cir. 2012) ("[T]emporal proximity between protected activity and adverse action may be sufficient to satisfy the causality element of a *prima facie* retaliation claim . . . ."); *Feingold*, 366 F.3d at 156 ("[T]he requirement that [plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two.").

In this case, Plaintiff does not argue that a causal connection can be established by temporal proximity, but rather argues that National Grid terminated her at their earliest opportunity subsequent to her complaint to Zarcano about Mondello's conduct — when they received an anonymous complaint about the installation of underground electrical service at Plaintiff's home.[19] (Pl. Opp'n Mem. 23–24 (citing *Curcio v. Roosevelt Union Free Sch. Dist.*,

---

[19] Several district courts have found that a causal connection between an employee's protected activity and the employer's adverse action can be established when the employer acts at its "first opportunity" to take an adverse action. *See Curcio v. Roosevelt Union Free Sch. Dist.*, No. 10-CV-5612, 2012 WL 3646935, at *14 (E.D.N.Y. Aug. 22, 2012) (finding a causal connection where plaintiff made a complaint to EEOC and was not scheduled to receive an evaluation or be considered for tenure until the following year); *Blanco v. Brogan*, 620 F. Supp. 2d 546, 556 (S.D.N.Y. 2009) (defendant's failure to promote plaintiff, decided more than three months after plaintiff filed an EEO complaint, was sufficient to establish a causal connection because "it would have been very difficult for the Police Department here to retaliate against Plaintiff during the time period except in terms of promotion" because "police departments generally have well-defined procedures and labor union agreements which prevent management from taking arbitrary adverse employment actions against their employees"); *Kanhoye v. Altana Inc.*, 686 F. Supp. 2d 199, 209 (E.D.N.Y. 2009) ("the December review was the first opportunity for defendants to evaluate Kanhoye after he began complaining of discrimination; a jury could conclude that an earlier opportunity to retaliate was unavailable"); *Quinby v. WestLB AG*, No. 04-CV-7406, 2007 WL 1153994, at *13 (S.D.N.Y. Apr. 19, 2007) (finding that the plaintiff "was denied her bonus at the first available opportunity," where "bonus determinations happen annually at a fixed point in time" and "a rational factfinder could conclude that [the defendant] attempted to replace [the plaintiff] in early 2003 but, lacking an acceptable replacement, waited until bonuses were announced to effect the termination."). The Second Circuit has not opined on the issue, *see Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 131 (2d Cir. 2012) (declining to reach this issue).

No. 10-CV-5612, 2012 WL 3646935, at *14 (E.D.N.Y. Aug. 22, 2012)).)   However, the absence

of any evidence in the record indicating when Plaintiff complained to Zarcano precludes any

inference that National Grid acted at the "earliest opportunity" subsequent to the complaint.

Although Plaintiff argues in her memorandum of law that this conduct took place in Fall 2009,

(Pl. Opp'n Mem. 5), the cited deposition testimony shows that Plaintiff stated that she was "not

exactly sure" when this incident occurred, and when asked if she recalled what year, stated

"2000 – no. No."  (Pl. Dep. 197:24–198:4.)

Even assuming that Plaintiff complained to Zarcano in Fall 2009, National Grid correctly

notes that there is no evidence that the decision-makers involved in Plaintiff's investigation and

termination in February 2011 had any knowledge of Plaintiff's complaint.   In order to establish

a causal connection, Plaintiff must show that the person responsible for her termination knew of

her complaint, or was influenced by someone who knew of the complaint.[20]  *See Henry*, 616

F.3d at 148 ("[A] jury may 'find retaliation even if the agent denies direct knowledge of a

plaintiff's protected activities, for example, so long as the jury finds that the circumstances

evidence knowledge of the protected activities or the jury concludes that an agent is acting

explicitly or implicit[ly] upon the orders of a superior who has the requisite knowledge.'"

(alteration in original) (quoting *Gordon*, 232 F.3d at 117)).

National Grid points to the sworn statements of Dorsey, McConnell and Biesner that

they "were not aware of any complaints of gender discrimination, harassment, or retaliation by"

---

[20]  Plaintiff's assertion that "the law is well settled that a plaintiff need only show general
corporate knowledge of the protected activity" to establish causation, (Pl. Opp'n Mem. 25 (citing
*Summa v. Hofstra Univ.*, 708 F.3d 111, 126–26 (2d Cir. 2013)), is misplaced.  The cited portion
of *Summa* discussed only the "employer knowledge" prong of the plaintiff's Title VII retaliation
claim, not the causation prong.

Plaintiff to show that these decision makers lacked knowledge.[21]  (Def. 56.1 ¶¶ 25–26; Def.

Reply 3–4.)  While a decision-maker's lack of knowledge of a plaintiff's protected activity can

suggest the lack of a causal connection, it is not dispositive of the issue.  A plaintiff can show a

causal connection even where the decision-makers lacked actual knowledge of her protected

activity by showing that the decision-makers "act[ed] pursuant to encouragement by a superior

(who has knowledge) to disfavor the plaintiff."  *Summa*, 708 F.3d at 127 (emphasis omitted)

(quoting *Henry*, 616 F.3d at 148)); *see also Papelino*, 633 F.3d at 92 ("[W]hile lack of

knowledge on the part of particular agents who carried out the adverse action is evidence of lack

of causal connection, a plaintiff may counter with evidence that the decision-maker was acting

on orders or encouragement of a superior who did have the requisite knowledge.").

District courts in this Circuit have also found that a plaintiff can show that the decision-

makers were motivated by retaliation by providing evidence that they were "overly deferential"

or influenced by a subordinate or co-worker who harbored retaliatory or discriminatory animus, a

situation often described as a "cat's paw" scenario.  *See Kregler v. City of New York*, No. 08-CV-

6893, 2013 WL 6620767 (S.D.N.Y. Dec. 9, 2013) ("In a cat's paw scenario, a nondecisionmaker

with a discriminatory motive dupes an innocent decisionmaker into taking action against the

plaintiff."  (quoting *Saviano v. Town of Westport*, No. 04-CV-522, 2011 WL 4561184, at *7 (D.

Conn. Sept. 30, 2011)); *Siani v. State Univ. of New York at Farmingdale*,  --- F. Supp. 2d ---, ---,

2014 WL 1260718, at *16 (E.D.N.Y. Mar. 28, 2014) ("an employer cannot shield itself from

liability . . .  by using a purportedly independent person or committee as the decisionmaker

---

[21]  Plaintiff does not dispute these statements, but contends that "National Grid"
nonetheless had knowledge of her complaints, as she had complained to three different
managers.  (Pl. 56.1 ¶¶ 25–26.)  As noted above, this argument is misplaced in the context of
establishing causation.

where th[at] decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." (quoting *Dedmon v. Staley*, 315 F.3d 948, 949 n.2 (8th Cir. 2003))).

Plaintiff offers no evidence that any of the decision-makers involved in the decision to terminate her were acting with the encouragement of a superior who did have the requisite knowledge, or were influenced by a subordinate or co-worker with knowledge of Plaintiff's complaint to Zarcano. *See Seivright v. Montefiore Med. Ctr., Hosp. of Albert Einstein Coll. of Med.*, No. 11-CV-8934, 2014 WL 896744, at *11–12 (S.D.N.Y. Mar. 3, 2014) (finding that plaintiff had not established a causal connection between her protected activity and termination where "there is no evidence that any of the individuals involved in her attempted return to Montefiore or termination knew that she had engaged in any of the listed protected activities," and plaintiff presented no evidence "of influence or encouragement" by a superior with knowledge of the protected activity); *Widomski v. State Univ. of N.Y. (SUNY) at Orange*, 933 F. Supp. 2d 534, 549 (S.D.N.Y. 2013) (finding no causal connection where there was no "evidence that the alleged retaliator . . . played a 'meaningful role' in the Board's decision or that the Board was 'overly deferential,' such that Defendant might be liable under a so-called 'cat's paw scenario.'"), *aff'd*, 748 F.3d 471 (2d Cir. 2014).

In sum, even assuming Plaintiff's protected activity of complaining to Zarcano about the conduct of a male co-worker took place in Fall 2009, Plaintiff cannot show a causal connection between this complaint and her termination, since there is no evidence that the decision-makers who investigated and ultimately terminated Plaintiff had actual knowledge of her complaint, acted with the encouragement of a superior with such knowledge, or at the behest of a subordinate with such knowledge. Because Plaintiff cannot show a causal connection, she has

failed to establish a *prima facie* case of retaliation. The Court grants National Grid's motion for summary judgment as to Plaintiff's retaliation claim.

### d. Hostile work environment claim against National Grid — Title VII and NYSHRL

Plaintiff claims that National Grid subjected her to a hostile work environment on the basis of gender in violation of Title VII and the NYSHRL. (Compl. ¶¶ 43, 45.) Plaintiff argues that she was "subjected to continuous and sustained abuse over a period of nearly three years," based on Delach's (1) excluding Plaintiff from informal and formal meetings with safety supervisors, (2) refusing to provide Plaintiff with updates concerning safety, work methods, incidents and accidents, (3) "regularly demanding" that Plaintiff perform administrative tasks, (4) regularly screaming at and speaking to Plaintiff in a condescending manner in front of other employees, (5) complaining about Plaintiff missing work to attend medical appointments, and (6) criticizing Plaintiff's performance and suggesting that she apply for a position that would be a demotion. (Pl. Opp'n Mem. 17–18.) Plaintiff also refers to three comments made by three employees over the course of three months referencing Plaintiff's buttocks and a female co-worker's breasts. (*Id*. at 18 (citing Setelius Aff. ¶¶ 15–16).)

In order to establish a Title VII hostile work environment claim, a plaintiff must produce evidence "that the complained of conduct (1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's" protected characteristic.[22] *Robinson v. Harvard Prot.*

---

[22] The same standards apply to Plaintiff's NYSHRL hostile environment claim. *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 n.4 (2d Cir. 2014) ("The same standards [as are applied to Title VII] apply to the plaintiffs' hostile environment claims arising under the NYSHRL . . . ." (citing, *inter alia*, *Whidbee v. Garzarelli Food Specialties, Inc.*, 223

*Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)).  To withstand summary judgment, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (quoting *Gorzynski*, 596 F.3d at 102).

While "'the central statutory purpose [of Title VII was] eradicating discrimination' in employment, Title VII 'does not set forth a general civility code for the American workplace.'"  *Redd*, 678 F.3d at 176 (alteration in original) (quoting *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 771 (1976) and *Burlington Northern,* 548 U.S. at 68).  A plaintiff may only recover on a hostile work environment claim if the hostile work environment occurs because of an employee's protected characteristic, such as her gender. *Rivera*, 743 F.3d at 20 (citing *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).

In addition, in order to establish employer liability under Title VII and the NYSHRL for hostile actions taken by employees, a plaintiff must establish that the hostile work environment can be imputed to the employer.  *See Summa*, 708 F.3d at 124 ("In order to prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct

---

F.3d 62, 69 (2d Cir. 2000))); *Summa*, 708 F.3d at 123–24 ("Hostile work environment claims under both [federal law] and the NYSHRL are governed by the same standard." (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006)))).  However, as discussed infra in n. 25, it is not clear whether the *Faragher/Ellerth* affirmative defense, available to Defendants under Title VII, is applicable in the context of a NYSHRL claim.  The Court therefore addresses the availability of this defense to Plaintiff's NYSHRL claim separately below.

creating the hostile work environment to the employer." (citing *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009))); *see also Vance v. Ball State Univ.*, 570 U.S. ---, ---, 133 S. Ct. 2434, 2443 (2013) (explaining under what circumstances an employer may be held liable for harassment by an employee).

Because National Grid is entitled to the affirmative *Faragher/Ellerth* defense, the Court declines to decide if the evidence is sufficient to create a genuine issue of fact as to whether Delach created a hostile work environment because of Plaintiff's gender.

### i. National Grid is entitled to the *Faragher/Ellerth* defense

Under *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), if a supervisor's harassment culminates in a tangible adverse employment action, the employer is strictly liable for that supervisor's harassment. *See Redd*, 678 F.3d at 182 ("If [a supervisor's] 'harassment culminate[d] in a tangible employment action, such as discharge, demotion, or undesirable reassignment,' the employer is held strictly liable, and '[n]o affirmative defense is available." (second and third alteration in original) (quoting *Ellerth,* 524 U.S. at 765, and citing *Faragher,* 524 U.S. at 808); *see also Vance*, 570 U.S. ---, 133 S. Ct. at 2439 (same). But if no tangible employment action is taken as a result of the harassment, or if "any tangible employment action taken against the employee was not part of the supervisor's discriminatory harassment," the employer may raise an affirmative defense. *Gorzynski*, 596 F.3d at 103 n.3; *see Redd*, 678 F.3d at 183 (acknowledging that "the employer may avoid liability by establishing [this] affirmative defense on which it has the burden of proof" but finding disputed issues of fact precluded summary judgment based on the defense).

To establish the *Faragher/Ellerth* affirmative defense, the employer must show "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing

behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 50 (2d Cir. 2012) (citing *Faragher*, 524 U.S. at 807 and *Ellerth*, 524 U.S. at 765); *Redd*, 678 F.3d at 182 (same); *see also Vance*, 570 U.S. ---, 133 S. Ct. at 2439 (restating two prongs of *Faragher/Ellerth* defense)  Although "[t]he defendant bears the ultimate burden of persuasion on this [second] element, . . . it may carry that burden by first introducing evidence that the plaintiff failed to avail herself of the defendant's complaint procedure and then relying on the absence or inadequacy of the plaintiff's justification for that failure." *Ferraro v. Kellwood Co*., 440 F.3d 96, 103 (2d Cir. 2006) (citing *Leopold v. Baccarat, Inc*., 239 F.3d 243, 246 (2d Cir. 2001)); *see Leopold*, 239 F.3d at 246 ("Once an employer has satisfied its initial burden of demonstrating that an employee has completely failed to avail herself of the complaint procedure, the burden of production shifts to the employee to come forward with one or more reasons why the employee did not make use of the procedures.").

Here, it is undisputed that Delach played no role in Plaintiff's termination nor took any tangible employment action against Plaintiff.  As a result, any harassment or other conduct by Delach did not culminate in Plaintiff's termination or any other tangible employment action, as required to hold National Grid strictly liable for Delach's conduct.  Consequently, National Grid may raise the affirmative *Faragher/Ellerth* defense.  *See Ferraro v. Kellwood Co*., 440 F.3d 96, 102 (2d Cir. 2006) (noting that the plaintiff's demotion and reduction of salary were tangible employment actions, but finding that, because the employer had established that "these actions were independent of [her supervisor's] discriminatory harassment" of the plaintiff, the employer was entitled to raise the *Faragher/Ellerth* defense); *Stofsky v. Pawling Cent. Sch. Dist.*, 635 F.

Supp. 2d 272, 295 (S.D.N.Y. 2009) (finding that the defendants were entitled to raise the

*Faragher/Ellerth* defense with plaintiff whose reassignment was found to be a tangible

employment action, because "Plaintiff has completely failed to rebut the evidence that she was

reassigned for reasons unrelated to any alleged harassment"); *Clarke v. Mount Sinai Hosp.*, No.

05-CV-566, 2007 WL 2816198, at *9 (E.D.N.Y. July 13, 2007) ("Gomez took no tangible

employment action against plaintiff and plaintiff's discharge was not related to Gomez's alleged

sexual advances. Thus, defendant has properly raised [the] *Faragher/Ellerth* affirmative

defense."); *see also Gorzynski*, 596 F.3d at 103 (noting that an employer may raise the

*Faragher/Ellerth* defense only if "any tangible employment action taken against the employee

was not part of the supervisor's discriminatory harassment," but declining to "address whether

[the plaintiff's] termination was linked to the supervisor's discriminatory harassment," because

the defendants had not met their burden to establish the defense anyway).

### 1.  National Grid exercised reasonable care

As to the first prong of the defense, National Grid argues that it exercised reasonable care

to prevent and correct any harassing behavior because it had an anti-harassment policy during the

period in question.  (Def. Mem. 19; *see* National Grid Human Resources Policy Guidelines

regarding Discrimination and Harassment, issued on October 1, 2008 ("Antidiscrimination

Policy," annexed to Dorsey Aff. as Ex. B).)  "Although not necessarily dispositive, the existence

of an anti-harassment policy with complaint procedures is an important consideration in

determining whether the employer has" exercised reasonable care to prevent and correct any

discriminatory harassment.  *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 128 (2d Cir. 2003)

(quoting *Caridad v. Metro-N. Commuter R.R.*, 191 F.3d 283, 295 (2d Cir. 1999))), *abrogated on

other grounds by Vance*, 570 U.S. ---, 133 S. Ct. 2434.  The Antidiscrimination Policy, in

pertinent part, defines "discrimination and harassment" as "verbal or physical conduct that degrades, shows hostility or aversion toward or discriminates toward an individual because of his or her . . . gender," and provides that any employee "should file a complaint if you feel that you are being discriminated against because of sexual harassment, . . . gender, sexual orientation, [or] gender identity," either by confronting the individual or by calling an internal ethics hotline or the "AlertLine." (Antidiscrimination Policy 1–2.) It further provides that "each member of management is responsible for . . . [e]nsuring that complaints brought to their attention are promptly reported to the Legal Department or Human Resources." (*Id.*)

National Grid's Antidiscrimination Policy is similar to policies that have been found to satisfy the first prong of the *Faragher*/*Ellerth* defense. *See Edrisse v. Marriott Int'l, Inc.*, 757 F. Supp. 2d 381, 388 (S.D.N.Y. 2010) (finding that employer-defendant acted reasonably to prevent harassment where its "anti-harassment policy, in force during the events of this case, expressly prohibited the sort of harassment of which plaintiff complains, and the company provided numerous avenues, including anonymous hotlines, by which employees could raise harassment grievances to persons including and besides harassing supervisors"); *O'Dell v. Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 389 (S.D.N.Y. 2001) (employer's antidiscrimination policy that "informed plaintiff that sexual harassment would not be tolerated and that it was her responsibility to advise management of potential sexual harassment . . . [and that] provided three harassment reporting mechanisms" sufficient to establish first prong of *Faragher*/*Ellerth* defense), *aff'd*, 40 F. App'x 628 (2d Cir. 2002).

Plaintiff acknowledges that she was aware of the policy and the fact that she could make a complaint as specified in the Antidiscrimination Policy, as well as to the human resources department, (*see* Pl. Dep. 64:20–66:9), and does not argue that the Antidiscrimination Policy was

ineffective.  Rather, Plaintiff asserts that National Grid did not exercise reasonable care, because she "complained about harassment on no less than four occasions."[23]  (Pl. Opp'n Mem. 19.) Although evidence of what an employer does when faced with an actual complaint is another important factor in determining whether a defendant can satisfy the first prong of its affirmative defense, here there is insufficient evidence that National Grid received an actual gender harassment complaint.  *See O'Dell*, 153 F. Supp. 2d at 389 ("Before an employer can reasonably respond to sexual harassment, it must have adequate notice of the harassment.")  Plaintiff made complaints to two supervisors on three occasions regarding Delach's conduct, and also made a comment to internal investigators from National Grid's ethics and compliance and human resources departments that she believed the purpose of them meeting with her was to discuss Delach's conduct.  But, based on Plaintiff's description of these incidents, none of these complaints were about *discriminatory* harassment, as opposed to generalized complaints or statements about Delach, such that National Grid would have had adequate notice of the complaint as required to trigger a duty to use reasonable care to respond to the complaint.[24]  *See*

---

[23]  Plaintiff makes this argument as to both prongs of the *Faragher*/*Ellerth* defense.  (*See* Pl. Opp'n Mem. 19.)  Although Plaintiff does not elaborate on what these four occasions were, the Court understands Plaintiff to mean the two complaints to Dwyer, a health and safety supervisor, that she was having "problems with" Delach, the complaint to Hohlman, a National Grid vice president, that she was having "problems with" her supervisor, and the comment at a meeting to Dorsey, a lead analyst in the National Grid Ethics and Compliance Office, and McConnell, a lead program manager in the human resources department, that she thought they had asked to meet with her to discuss "Delach's conduct towards me."

[24]  Plaintiff's complaint to a third individual, Zarcano, involved a single incident of mistreatment by one of Plaintiff's co-workers, not her supervisor Delach, and National Grid's failure to respond to a report of mistreatment by a co-worker cannot render it liable for the allegedly gender-based conduct of Delach.  Plaintiff does not assert and cannot establish that her co-worker Mondello's single conduct of screaming at Plaintiff over the telephone comprises a hostile work environment.  Therefore Plaintiff's complaint about Mondello's conduct cannot, by

*Schmidt v. State Univ. of New York at Stonybrook*, No. 02-CV-6083, 2006 WL 1307925, at *14 (E.D.N.Y. May 9, 2006) (finding that defendant was not on notice of plaintiff's complaint about discriminatory harassment where "Plaintiff provided only general comments that she was 'uncomfortable' and felt Miller was 'overbearing,' which fall short of establishing constructive notice of harassment."); *O'Dell*, 153 F. Supp. 2d at 391 n.6 (finding that statements to other supervisors urging them not to promote her allegedly harassing supervisor did not adequately notify the employer that plaintiff was complaining about sexual harassment, and noting that "[a]n employer is not clairvoyant and cannot be expected to divine that a general complaint about an employee is a masked grievance of sexual harassment"); *cf. Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000) ("Once an employer has knowledge of a racially combative atmosphere in the workplace, he has a duty to take reasonable steps to eliminate it." (alteration omitted) (quoting *Snell v. Suffolk County,* 782 F.2d 1094, 1104 (2d Cir. 1986))).

Because National Grid presents evidence of a comprehensive Antidiscrimination Policy, and there is no evidence that it had adequate notice of any complaint by Plaintiff of harassing conduct, Plaintiff cannot show that National Grid failed to exercise reasonable care. National Grid has established the first prong of the *Faragher*/*Ellerth* defense.

### 2. Plaintiff unreasonably did not take advantage of the Antidiscrimination Policy

As to the second prong, National Grid has shown that Plaintiff unreasonably failed to take advantage of the avenue for complaints, by making only generalized complaints about Delach's conduct to two different supervisors, on three occassions. *See E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 466 (5th Cir. 2013) (noting that "the evidence was thin on th[e]

---

itself, negate Defendant's assertion that it is entitled to the *Faragher*/*Ellerth* defense with respect to the alleged harassment by Delach.

[second *Faragher/Ellerth*] prong: Woods's initial informal complaints to Carpenter made no reference to sexual harassment, and Woods did not raise the issue with Duckworth until months later"). Title VII is designed to prevent and remediate discriminatory conduct in the workplace. To that end, the *Faragher/Ellerth* defense has developed as a way to recognize and create incentives for employers who take proactive measures to prevent discrimination. *See Cox v. Onondaga Cnty. Sheriff's Dep't*, --- F. App'x ---, ---, 2014 WL 3610747, at *9 (2d Cir. July 23, 2014) ("Employers are under an independent duty to investigate and curb . . . harassment by lower level employees of which they are aware. This is because the primary purpose of Title VII 'is not to provide redress but to avoid harm.'" (citing *Duch v. Jakubek,* 588 F.3d 757, 762 (2d Cir. 2009) and quoting *Faragher*, 524 U.S. at 806)); *see also Faragher*, 524 U.S. at 803 (""Although Title VII seeks to make persons whole for injuries suffered on account of unlawful employment discrimination, its primary objective, like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm.").

Plaintiff's comments to two different supervisors about Delach's conduct, and her comment to internal investigators about Delach's conduct, cannot reasonably be described as an effort to utilize National Grid's Antidiscrimination Policy. These complaints were generalized complaints about Delach's conduct that in no way referenced Plaintiff's belief that such conduct was discriminatory or otherwise gender-based. Where, as here, there is a clearly established policy that provided Plaintiff with an avenue for making a formal complaint about discriminatory harassment, and as Plaintiff concedes she was aware of the policy, Plaintiff cannot seek a remedy in federal court since she did not provide National Grid with the opportunity to provide a remedy in the workplace.

### 3. Plaintiff has not shown a credible fear of retaliation

Plaintiff asserts that she "did not report Delach to human resources because [she] feared retaliation," and because she was advised by Marinello that Delach "was concerned that I would report his mistreatment . . . to human resources." (Setelius Aff. ¶ 14.)

A plaintiff's failure to report discriminatory harassment may be excused where the plaintiff "has 'a credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint.'" *Chin-McKenzie v. Continuum Health Partners*, 876 F. Supp. 2d 270, 285 (S.D.N.Y. 2012) (citing *Leopold v. Baccarat,* 239 F.3d 243, 246 (2d Cir. 2001). To establish that a credible fear precluded her from making an internal complaint, "a plaintiff must produce evidence showing that his or her fear is 'credible,' such as proof 'that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints.'" *Finnerty v. William H. Sadlier, Inc.*, 176 F. App'x 158, 163 (2d Cir. 2006) (quoting *Leopold,* 239 F.3d at 246)).

Here, other than her conclusory allegation that she did not go to human resources because she feared retaliation, Plaintiff has not presented any evidence to substantiate her assertion that she had a credible fear of retaliation, such as evidence about the relationship between Delach and human resources that caused her to fear retaliation, or evidence that others who lodged complaints faced retaliation, or any other factual basis from which Plaintiff could reasonably have concluded that she would face retaliation if she complained to human resources about Delach's conduct. *See Leopold*, 239 F.3d at 246 (finding that plaintiff had not established a credible fear of retaliation for making a complaint of harassment, where plaintiff "simply asserted her apprehension that she would be fired for speaking up," and holding that "[s]uch conclusory assertions fail as a matter of law to constitute sufficient evidence to establish that her fear was credible — that her complaint would not be taken seriously or that she would suffer

some adverse employment action." (citation and internal quotation marks omitted)); *Stofsky v. Pawling Cent. Sch. Dist.*, 635 F. Supp. 2d 272, 296 (S.D.N.Y. 2009) ("Because Plaintiff did not come forward with any . . . evidence [that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints] in support of her view that her failure to complain was reasonable, she cannot defeat Defendants' *Faragher/Ellerth* defense."); *O'Dell*, 153 F. Supp. 2d at 392 ("conclusory allegations of feared repercussions" insufficient to establish that plaintiff had a credible fear that prevented her from making an internal complaint of sexual harassment (quoting *Fierro v. Saks Fifth Ave.*, 13 F. Supp. 2d 481, 492 (S.D.N.Y. 1998))), *aff'd*, 40 F. App'x 628 (2d Cir. 2002). Plaintiff has not overcome National Grid's showing that she unreasonably failed to take advantage of National Grid's Antidiscrimination Policy.

Thus, even if Plaintiff could establish that Delach's conduct created a hostile work environment, National Grid is entitled to summary judgment as to Plaintiff's Title VII and NYSHRL claims of hostile work environment on the basis of the *Faragher/Ellerth* affirmative defense.[25]

---

[25] Whether the *Faragher/Ellerth* defense is available to claims brought under the NYSHRL is not a fully-settled question. In an unpublished 2007 decision, the Second Circuit noted that "New York State law is not clear as to the application of this defense to cases under the Executive Law," and declined to find that a defendant was entitled to the *Faragher/Ellerth* defense under NYSHRL, remanding instead to state court. *McPherson v. NYP Holdings, Inc.*, 227 F. App'x 51, 53–54 (2d Cir. 2007) (citing *Perks v. Town of Huntington*, 251 F. Supp. 2d 1143, 1159 (E.D.N.Y. 2003) and *Vitale v. Rosina Food Products Inc.*, 727 N.Y.S.2d 215, 219 (App. Div. 2001)). The New York Court of Appeals has twice suggested, without holding, that the *Faragher/Ellerth* defense is available under the NYSHRL. In *Forrest v. Jewish Guild for the Blind*, the court noted, "[s]ince plaintiff has failed to establish the elements of a hostile work environment claim with respect to either her state or city causes of action, we need not address the affirmative defense to such a claim against an employer — that the employer exercised reasonable care to prevent and correct promptly discriminatory conduct committed by its supervisory personnel, such as by promulgating an antidiscrimination policy with complaint

procedure, and that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm." 3 N.Y.3d 295, 312 (2004) (citing *Ellerth*, 524 U.S. at 765 and *Faragher*, 524 U.S. at 805–08))). In *Zakrzewska v. New School*, the New York Court of Appeals strongly suggested that the defense is available under the NYSHRL, while holding that the *Faragher/Ellerth* defense is not available under the NYCHRL. *Zakrzewska*, 14 N.Y.3d 469, 481 (2010). The court arrived at this conclusion by contrasting the NYCHRL with the NYSHRL, and in doing so, noted that (1) "we have always strived to 'resolve federal and state employment discrimination claims consistently,'" and (2) "[u]nlike state law . . . the NYCHRL creates an interrelated set of provisions to govern an employer's liability for an employee's unlawful discriminatory conduct in the workplace. This legislative scheme simply does not match up with the *Faragher–Ellerth* defense." *Id.*; *see also Joyner v. City of New York*, No. 11-CV-4958, 2012 WL 4833368, at *4 (S.D.N.Y. Oct. 11, 2012) ("Although there appears to be no controlling authority establishing that the *Ellerth/Faragher* defense is available to claims under state law, the New York State Court of Appeals has suggested that this is so, the plaintiff does not argue otherwise." (citing *Zakrzewska*, 14 N.Y.3d at 479)). Several New York Supreme Court, Appellate Division cases have recognized the *Faragher/Ellerth* defense. *See Barnum v. N.Y.C. Transit Auth.*, 878 N.Y.S.2d 454, 455–56 (App. Div. 2009) ("[U]nder Executive Law § 296, it is a defense to a claim of harassment arising from the conduct of a supervisory employee that the employer "exercised reasonable care to prevent and correct promptly [the] discriminatory conduct . . . and that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm" (quoting *Forrest*, 3 N.Y.3d at 312 n.10)), *abrogated on other grounds by Nelson v. HSBC Bank USA*, 929 N.Y.S.2d 259 (App. Div. 2011); *Winkler v. N.Y.S. Div. of Human Rights*, 872 N.Y.S.2d 797, 798 (App. Div. 2009) ("An employer may assert as an affirmative defense that it 'exercised reasonable care to prevent and correct promptly discriminatory conduct committed by its supervisory personnel, such as by promulgating an antidiscrimination policy with complaint procedure, and that the [employee] unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm'" (quoting *Forrest*, 3 N.Y.3d at 312 n. 10)); *Dunn v. Astoria Fed. Sav. & Loan Ass'n*, 856 N.Y.S.2d 114, 115 (App. Div. 2008) ("Dismissal of plaintiff's sexual harassment/hostile work environment claim was also appropriate, since plaintiff failed to avail herself of Astoria's anti-discrimination policy of which she was aware" (citing *Ellerth*, 524 U.S. at 765 and *Faragher*, 524 U.S. at 807–08)); *Vitale v. Rosina Food Products Inc.*, 727 N.Y.S.2d 215, 219 (App. Div. 2001) (noting that the Faragher/Ellerth defense "allows an employer, under certain circumstances, to avoid vicarious liability to an employee subjected to a hostile work environment created by a supervisor with immediate 'or successively higher' authority over the employee" (citing *Ellerth*, 524 U.S. at 745)).

Some district courts have also applied the defense to claims under the NYSHRL. *See Adams v. City of New York*, 837 F. Supp. 2d 108, 125 (E.D.N.Y. 2011) (noting that "[f]or claims under Title VII and the NYSHRL, the employer may be permitted, 'subject to proof by a preponderance of the evidence,' to raise the *Faragher/Ellerth* affirmative defense to liability," but finding that defendant had not made the requisite showing (quoting *Gorzynski*, 596 F.3d at 103)); *Audrey v. Career Inst. of Health & Tech.*, No. 06-CV-5612, 2010 WL 10094570, at *17 (E.D.N.Y. Jan. 12, 2010) (granting summary judgment as to plaintiff's hostile work environment

### e. Equal Pay Act claim against National Grid

Plaintiff claims that National Grid willfully violated her rights pursuant to the Equal Pay Act (EPA) by failing to pay her wages equal to those paid to men for equal work. (Compl. ¶ 44.) The Equal Pay Act "prohibits employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for 'equal work.'" *Chepak v. Metro. Hosp.*, 555 F. App'x 74, 76 (2d Cir. 2014) (quoting *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999)). To establish a claim, a plaintiff must make an initial showing that "[(1)] the employer pays different wages to employees of the opposite sex; [(2)] the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and [(3)] the jobs are performed under similar working conditions." *Id.* (quoting *Belfi*, 191 F.3d at 135.) If a plaintiff can make this showing, "the burden shifts to the employer to demonstrate that wage disparities are due to a seniority system, a merit system, a system that measures earnings based upon quantity or quality of production, or other differentials based on any factor other than sex, provided it was implemented for a legitimate business reason." *Forden v. Bristol Myers Squibb*, 63 F. App'x 14, 15 (2d Cir. 2003) (quoting *Belfi*, 191 F.3d at 136). "Once the employer proves

---

claim under NYSHRL based on the *Faragher/Ellerth* defense), *report and recommendation adopted*, No. 06-CV-5612, 2014 WL 2048310 (E.D.N.Y. May 18, 2014).

In light of the intimations in two New York Court of Appeals cases that the *Faragher/Ellerth* defense does apply to claims brought under the NYSHRL, the decisions of the intermediate level New York state courts, and the broader principle that the Second Circuit and the New York Court of Appeals "typically treat[s] Title VII and NY[S]HRL discrimination claims as analytically identical, applying the same standard of proof to both claims," *Salamon*, 514 F.3d at 226, *see also Forrest*, 3 N.Y.3d at 316 (noting that NYSHRL discrimination claims were "in accord with the federal standards under title VII of the Civil Rights Act of 1964"), the Court applies the *Faragher/Ellerth* defense to Plaintiff's NYSHRL hostile work environment claim. *See Perks*, 251 F. Supp. 2d at 1159 ("Given [the Second Circuit's] guidance and the longstanding practice of looking to Title VII case law when interpreting the NY[S]HRL, this Court applies the Supreme Court's [*Faragher/Ellerth*] framework to Perks' NY[S]HRL claim as well as his Title VII claim.").

that the wage disparity is justified by one of the EPA's four affirmative defenses, 'the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination.'" *Ryduchowski v. Port Auth. of N.Y. & N.J.*, 203 F.3d 135, 142 (2d Cir. 2000) (quoting *Belfi,* 191 F.3d at 136).

Plaintiff alleges in her Complaint that she was paid differently from unnamed male colleagues, and in her deposition testimony explained that her "complaint is [about] field supervisors that were brought in from outside of the company with no knowledge of their abilities and capabilities and were starting at a much higher salary," and identified three such individuals, "Sam S.,"[26] Martin Lyons and James Luckie, who were paid more than her. (Compl. ¶ 13; Pl. Dep. 72:8–73:5.)  In her opposition to National Grid's motion for summary judgment, Plaintiff asserts that she was also paid less than James Keagins and Sal Marinello.  (Pl. Opp'n  21–22.)  The Court considers Plaintiff's claims as to each of these individuals.

### i.   Simon "Sam" Sarcona

National Grid argues that Plaintiff's claims as to Sarcona are time-barred, as he was hired in 2004 and voluntarily left the company in 2006, and the statute of limitations for an Equal Pay Act claim is two years.  (Def. Mem. 20–21; Affidavit of Maryjane Baer, annexed to Def. Notice of Motion at Docket Entry No. 31 ("Baer Aff.") ¶ 9.)  Plaintiff does not contest this assertion.  In addition, Plaintiff's Complaint was filed on November 14, 2011, more than four years after the last day on which an Equal Pay Act claim as to Sarcona could have accrued.  *See* 29 U.S.C. § 255 (establishing two year statute of limitations for Equal Pay Act claims, and three years for willful violations); *McGullam v. Cedar Graphics, Inc.*, No. 04-CV-2891, 2007 WL 4326819,

---

[26]  Defendants identify this individual as Simon Sarcona, who also goes by the first name "Sam."  (Affidavit of Maryjane Baer, annexed to Def. Notice of Motion at Docket Entry No. 31 ¶ 3.)

at *1 (E.D.N.Y. Dec. 7, 2007) ("Claims brought pursuant to the Equal Pay Act are subject to a two-year statute of limitations, except with respect to allegations of willful violations, which are subject to a three-year limitations period. " (citing *Pollis v. New School for Social Research,* 132 F.3d 115, 118 (2d Cir. 1997)).  Accordingly, Plaintiff's claims under the EPA as to Sarcona are dismissed.

### ii.  Martin Lyons

National Grid argues that Plaintiff cannot establish a *prima facie* case under the EPA as to Lyons because she was not paid less than Lyons.  Lyons was paid $90,000 and Plaintiff was paid $91,960 at the time of Plaintiff's termination in February 2011.  (Def. Mem. 22 (citing Baer Aff. ¶ 4).)  Plaintiff does not contest National Grid's assertion.  Accordingly, Plaintiff's claim under the EPA as to Lyons is dismissed.

### iii.  Jamies Luckie

National Grid argues that, assuming that Plaintiff was paid differently than Luckie, despite sharing the same job title, the pay differential was because Luckie was hired from outside National Grid to work at a different location than Plaintiff in 2005, held a bachelor's degree in engineering at the time of his hiring, and had worked as a supervisor for at least eight years prior to being hired by National Grid.  (Def. Mem. 23 (citing Baer Aff. ¶¶ 12–13); *see* Def. 56.1 ¶¶ 47–53.)  National Grid notes that, in contrast, at the time Plaintiff was promoted to Field Supervisor [in 2004], she "did not have a college degree or prior relevant supervisory experience, and never actually worked in [the] field herself."  (*Id*. (citing Setelius Dep 10[:2]–14[:20] and Baer Aff. ¶ 7).)  Plaintiff argues that "given that both employees held the same job title, this argument does not prove that gender was not a factor."  (Pl. Opp'n Mem. 21.)

Plaintiff's argument is not supported by case law. While the fact that Plaintiff shared the same job title with Luckie may support the establishment of Plaintiff's *prima facie* case of pay differential, it is insufficient, by itself, to overcome the explanation proffered by National Grid — that Luckie had eight years of supervisory experience and a bachelor's degree in engineering, while Plaintiff had no prior supervisory experience and no degree. (*See* Pl. Resp. 56.1 ¶¶ 47–53.) Both of these facts provide a factor other than sex for the difference in pay to Plaintiff and Luckie. So too does the fact that Luckie was hired from outside the company, as National Grid considered a prospective employee's earnings immediately prior to his or her employment with National Grid in determining the starting salary. (Baer Aff. ¶ 5); *see Virgona v. Tufenkian Imp.-Exp. Ventures, Inc.*, No. 05-CV-10856, 2008 WL 4356219, at *10 (S.D.N.Y. Sept. 23, 2008) (granting defendant's motion for summary judgment as to EPA claim, finding that the difference between the plaintiff's qualifications and that of a male comparator sufficed to provide a "factor other than sex" explanation for pay differential, where the comparator had "a bachelor's degree in accounting, an MBA, and a CPA license, [and] also possessed twelve years of experience in the field," while plaintiff did not have a college degree and, while she "possessed approximately seven to ten years of experience in the field at the time of hire, she had never worked as an assistant controller or as a controller'"); *Drury v. Waterfront Media, Inc.*, No. 05-CV-10646, 2007 WL 737486, at *4 (S.D.N.Y. Mar. 8, 2007) (granting defendant's motion for summary judgment as to EPA claim, finding that "[s]alary matching and experience-based compensation are reasonable, gender-neutral business tactics, and therefore qualify as 'a factor other than sex.'"); *Osborn v. Home Depot U.S.A., Inc.*, 518 F. Supp. 2d 377, 385 (D. Conn. 2007) (noting that "market forces, previous experience, education, and inducement to hire the best person for the job have been held to be legitimate factors justifying pay differentials under the EPA" and

denying summary judgment in light of factual disputes as to these factors " (citing cases)); *Cox v. Quick & Reilly, Inc.*, 401 F. Supp. 2d 203, 213–14 (N.D.N.Y. 2005) (noting that "various courts have held that experience, seniority, and salary-retention policies can sometimes be legitimate, gender-neutral justifications sufficient to rebut a *prima facie* showing of discrimination in violation of the EPA," but finding a genuine issue of material fact as to whether these factors were pretextual); *Howard v. Cmty. Action Org. of Erie Cnty., Inc.*, No. 01-CV-0784, 2003 WL 21383271, at *3 (W.D.N.Y. May 30, 2003) (granting defendant's motion for summary judgment as to EPA claim, finding that the defendant "satisfied its burden of persuasion by demonstrating that [the male comparator's] higher compensation was a result of legitimate non-discriminatory factors – to wit, experience and seniority."); *but see Chin v. Chinatown Manpower Project*, No. 11-CV-5270, 2014 WL 2199424, at *17 (S.D.N.Y. May 23, 2014) ("While defendants raise a number of potentially dispositive defenses, including relative qualifications and necessity in order to retain the services of a highly desirable candidate, the viability of such defenses is normally a question for a jury.").

Once National Grid has established "that the wage disparity is justified by one of the EPA's four affirmative defenses," Plaintiff must present evidence to show that its reasons are pretext. *See Ryduchowski*, 203 F.3d at 142 ("[T]he plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination.") Plaintiff does not argue that Luckie's prior experience, greater educational credentials, and the fact that he was an external hire were factors used by National Grid as a pretext for discrimination. Plaintiff's only assertion is that "given that both employees held the same job title, [National Grid's explanation] does not prove that

gender was not a factor." (Pl. Opp'n Mem. 21.) This is insufficient to meet her burden to show that the reason proffered by National Grid is pretext for sex discrimination.

Nor is there sufficient evidence in the record from which a reasonable jury could find that National Grid's explanation is pretext for sex discrimination. In evaluating a plaintiff's argument that the defendant's explanation is pretext, the court looks to "whether the employer has used the [justification] reasonably in light of the employer's stated purpose as well as its other practices." *Osborn*, 518 F. Supp. 2d at 386 (quoting *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526 (2d Cir. 1992)). National Grid has offered evidence that it "values employees with professional degrees and extensive work experience," and "[g]enerally, [it] compensates the employees with professional degrees and extensive work experience at a higher level, as compared to employees without these attributes." (Baer Aff. ¶ 5.) In the absence of any evidence by Plaintiff to overcome this explanation, no reasonable jury could find that the explanation is pretext for sex discrimination. *Compare Belfi*, 191 F.3d at 137–38 ("Other evidence presented by plaintiff [of inconsistent explanations by the defendants] convinces us that there exist genuine issues of material fact regarding pretext sufficient to preclude a grant of summary judgment."). Accordingly, the Court grants National Grid's motion for summary judgment of Plaintiff's EPA claim as to Luckie.

### iv. James Keagins and Sal Marinello

Plaintiff argues for the first time in her opposition papers that James Keagins and Sal Marinello were paid more than her for substantially equivalent work. (Pl. Opp'n Mem. 21.) Plaintiff cites to tables purportedly documenting the annual salaries for Plaintiff, Keagins and Marinello, which are annexed to Plaintiff's affidavit. (*See* untitled table, annexed to Setelius Aff. as Ex. 4 ("Setelius salary table"); untitled table, annexed to Setelius Aff. as Ex. 5 ("Marinello

salary table"); untitled table, annexed to Setelius Aff. as Ex. 6 ("Keagins salary table").)

According to the table, Plaintiff earned a salary of $91,960 on June 27, 2010, while Keagins

earned a salary of $101,889 and Marinello earned a salary of $95,599 on the same date. All

three individuals shared the title "Senior Supervisor – Electric," beginning on September 25,

2005 for Keagins and Plaintiff, and September 25, 2004 for Marinello. Prior to the change in

salary on September 25, 2005, Plaintiff was earning a salary of $69,350, while Keagins was

earning a salary of $91,600; on September 25, 2004, Marinello earned a salary of $79,300. Thus,

Plaintiff has established her *prima facie* case of pay differential as to Keagins and Marinello.

National Grid argues that Plaintiff conceded in her deposition testimony that she does not

assert an EPA claim with respect to either Keagins or Marinello because both of those

individuals were promoted to the field supervisor position from a lineman position, which was a

higher-paying position than the work coordinator position from which Plaintiff was supervised.

(Def. Reply 10 (citing Pl. Dep. 71).) Plaintiff argues that National Grid has offered no legitimate

business reason for why Keagins and Marinello were paid more than her.[27] (Pl. Opp'n Mem.

21.)

Keagins was hired by a predecessor to National Grid in 1984, two years before Plaintiff

started working for National Grid. (Reply Affidavit of Kathleen Gangarossa, annexed to Def.

---

[27] National Grid does not make an argument in opposition to Plaintiff's claim, but only asserts that Plaintiff may not now change her testimony in an effort to defeat summary judgment. (Def. Reply 10 (citing *Reza v. Khatun*, No. 09-CV-233, 2013 WL 596600, at *8 (E.D.N.Y. Feb. 15, 2013) and *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).) Although it is well-established that "factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony," *Brown*, 257 F.3d at 252, here, Plaintiff is not making a factual allegation in a sworn affidavit that contradicts her prior testimony. Rather, she is asserting a claim in her memorandum of law that she appears to have abandoned in her deposition testimony. In the interest of fully addressing the legal arguments raised by Plaintiff, the Court addresses Plaintiff's claims on the merits.

Notice of Motion as Docket Entry No. 40 ("Gangarossa Aff.") ¶ 4, Def. 56.1 ¶ 1; Pl. Resp. 56.1 ¶ 1.)  Keagins was promoted to "apprentice lineman" in 1986, and to "lineman first class" in 1988, and then to "a supervisory position within the Overhead and Underground Lines Department" of the company in 1997, four years prior to Plaintiff's first promotion to a management position as a work coordinator, in 2001.  (Gangaross Aff. ¶ 5; Def. 56.1 ¶ 2; Pl. Resp. 56.1 ¶ 2.)  Marinello was hired by a predecessor to National Grid in 1963 as a groundman in the Overhead Lines and Services Department, and was selected to work as an apprentice lineman in 1965.  (Gangarossa Aff. ¶ 7.)  Marinello worked as a lineman until 1976, when he left the company.  (*Id*. ¶ 8.)  Marinello returned to the company in 1999, as a Field Supervisor. (*Id*. ¶ 10.)   According to Plaintiff's deposition, the lineman position, as a skilled job, is one of the highest paid positions under the labor contract.  (Pl. Dep. 68:9–17.)  Plaintiff acknowledged that "some of the field supervisors were former lineman," and "they would have been at the highest ranks of the labor contract."  (*Id*. at 70:18–22.)  Plaintiff explained that "[t]hat's not where my complaint lies. . . . My complaint is elsewhere."  (*Id*. at 70:23–71:9.)  She affirmed that she "recognize[d] that there are field supervisors who came to the position of field supervisor from positions that paid more than [her] position paid," and "agree[d] that that would be an explanation for why those field supervisors made more money than" her.  (*Id*. 70:25–71:8.) Accordingly, there is a nondiscriminatory reason in the record for the pay difference between both Keagins and Marinello, and Plaintiff — the fact that they previously worked as linemen while Plaintiff had not — which Plaintiff has not shown is pretextual, and has acknowledged is a valid basis for the difference in pay, at least initially.

However, Plaintiff argues that summary judgment is inappropriate as to Marinello because he received higher pay raises than she did.  (Pl. Opp'n Mem. 21–22.)   Plaintiff argues

that she and Marinello reported to the same supervisor, Delach, who consistently spoke highly of Plaintiff at a bi-annual meeting of section managers where the section managers make arguments as to where their subordinates should be ranked, and that Delach consistently disparaged Marinello's performance and attitude, and yet Marinello was ranked higher than Plaintiff as a result of the decisions made at the section manager meetings. (*Id*.) Plaintiff concedes that the reason Marinello received higher raises than Plaintiff was because "supervisor salaries are based upon rankings, and Marinello was consistently ranked higher than" Plaintiff. (Pl. Opp'n Mem. 21 (citing Delach Dep. 44–48).) The crux of Plaintiff's claim appears to be that the collective decision made by section managers to rank Marinello higher than Plaintiff was wrong, in light of the consistent advocacy by their supervisor, Delach, that Plaintiff should be ranked higher than Marinello. (*See* Pl. Opp'n Mem. 22.) The implicit conclusion Plaintiff draws is that this collective decision must therefore have been motivated by gender. This speculation is insufficient to meet Plaintiff's burden to "counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *See Ryduchowski*, 203 F.3d at 142. Plaintiff has only alleged discriminatory conduct on the part of Delach, and here, Plaintiff asserts that Delach was strenuously advocating on her behalf for a higher ranking than that of her comparator Marinello, but that the decision ultimately as to her rank and her pay was made by others. These facts undermine, rather than support, Plaintiff's claim of unequal pay based on gender.

In sum, because Plaintiff's Equal Pay Act claims are either time-barred, lacking a *prima facie* case of pay differential, or fail to show that National Grid's nondiscriminatory reasons for the differential pay is gender-based, the Court grants National Grid's motion for summary judgment on all of Plaintiff's Equal Pay Act claims against National Grid.

### f. Delach's personal liability under NYSHRL

Plaintiff contends that Delach "knowingly and/or recklessly aided, abetted, incited, compelled, coerced and/or actively participated" in National Grid's unlawful conduct, (Compl. ¶ 46), and is personally liable under the NYSHRL for Plaintiff's unequal pay and hostile work environment claims as a supervisor who "actually participates in the conduct giving rise to a discrimination claim."[28] (Pl. Opp'n Mem. 25 (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995).) Delach argues that "it is well-established that an individual cannot be held liable under the NY[S]HRL for aiding and abetting his own alleged discriminatory conduct." (Def. Mem. 25 (citing *Nunez v. Cuomo*, No. 11-CV-3457, 2012 WL 3241260, at *20 (E.D.N.Y. Aug. 7, 2012) and *Virola v. XO COmms., Inc.*, No. 05-CV-5056, 2008 WL 1766601, at *20 (E.D.N.Y. Apr. 15, 2008)).) Plaintiff asserts that "[t]he Second Circuit has made it clear that a supervisor 'who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the [NYS]HRL.'" (Pl. Opp'n Mem. 25 (quoting *Tomka*, 66 F.3d at 1317)).

The NYSHRL allows for individual liability under two theories: (1) if the defendant has "an ownership interest" in the employer or has the authority to hire and fire employees," N.Y.

---

[28] In the Complaint Plaintiff alleges that Delach is individually liable for "the aforementioned conduct in violation of the NYSHRL." (Compl. ¶ 46.) It is unclear if this is meant to allege claims of liability as to all of Plaintiff's NYSHRL claims asserted against National Grid. It is equally unclear whether, by discussing only Plaintiff's unequal pay and hostile work environment claims in the memorandum of law, and not addressing her NYSHRL claims of discrimination and retaliation, Plaintiff concedes that Delach is not individually liable for these claims, or that she intends to assert a claim of individual liability pursuant to the Equal Pay Act. In an abundance of caution, the Court analyzes Delach's individual liability as to all of Plaintiff's NYSHRL claims against National Grid: discrimination, retaliation and hostile work environment, as well as the allegation that Delach is individually liable for the unequal pay.

Exec. Law § 296(1),[29] and (2) if the defendant was aiding and abetting the unlawful discriminatory acts of others, *id.* § 296(6).[30]

Plaintiff does not invoke the first of these theories.[31]  Rather, she asserts that Delach is liable as an aider and abetter under the NYSHRL.  (Compl. ¶ 46.)  The Second Circuit has read § 296(6) broadly to find that supervisors and co-workers can be liable pursuant to this section even if they do not have the ability to hire and fire employees, so long as they "actually participate[d] in the conduct giving rise to the discrimination."  *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004) (alteration omitted) (quoting *Tomka*, 66 F.3d at 1317); *see also Scalera*, 2012 WL 991835, at *14–15 (citations omitted) ("An individual can also be held liable under § 296(6) when he or she 'actually participates in the conduct giving rise to a discrimination claim.'").

---

[29]  *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995) (noting that "an employee is not individually subject to suit under § 296 of the HRL as an employer 'if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others'" (quoting *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 542 (1984))), *abrogated on other grounds by Ellerth*, 524 U.S. at 742.

[30]  Section 296(6) of the NYSHRL provides that: "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."  N.Y. Exec. Law § 296(6).

[31]  Moreover, because Delach does not have an ownership interest in National Grid and there is no evidence that he had the power to hire or fire any employees, he is not subject to liability under § 296(1) of the NYSHRL.  In addition, it is clear from the record that Delach did not play a role in the decision to terminate Plaintiff.  *See Edwards v. Jericho Union Free Sch. Dist.*, 904 F. Supp. 2d 294, 304 (E.D.N.Y. 2012) (finding plaintiff did not state a claim of individual liability pursuant to § 296(1), where the plaintiff "does not allege that either school principal had the power or authority to hire or fire plaintiff, or that they had the ability to do anything more than 'carry out personnel decisions' made by the Board and/or District." (quoting *Patrowich*, 63 N.Y.2d at 542 (1984))). Counsel for Plaintiff conceded at oral argument that Plaintiff is not claiming Delach is liable pursuant to § 296(1).

Liability as an aider and abettor under § 296(6) can be established only when liability has first been established as to the employer or another person. *See Redd v. N.Y.S. Div. of Parole*, 923 F. Supp. 2d 371, 392 (E.D.N.Y. 2012) ("Under New York law, 'liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor.'" (quoting *DeWitt v. Lieberman,* 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999))); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 688 (S.D.N.Y. 2012) ("'[L]iability under the [NYS]HRL . . . must first be established as to the employer/principal before an individual may be considered an aider and abettor.'" (quoting *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 490 (S.D.N.Y. 1999))); *Raneri v. McCarey*, 712 F. Supp. 2d 271, 282 (S.D.N.Y. 2010) ("Where no violation of the Human Rights Law by another party has been established, we find that an individual employee cannot be held liable for aiding or abetting such a violation." (citing *Strauss v. N.Y.S. Dep't of Educ.*, 805 N.Y.S.2d 704, 709 (App. Div. 2005))); *see also Hardwick v. Auriemma*, 983 N.Y.S.2d 509, 513 (App. Div. 2014) ("Since it is alleged that Auriemma's own actions give rise to the discrimination claim, he cannot also be held liable for aiding and abetting."), *leave to appeal denied*, No. 2014-533, 2014 WL 2936031 (N.Y. July 1, 2014); *cf. Feingold*, 366 F.3d at 151, 156, 158 (denying the defendant's motion for summary judgment as to the plaintiff's claims of disparate treatment and hostile work environment asserted against the employer, and also finding that the plaintiff "has presented sufficient evidence to create a triable question as to whether each of the named individual defendants 'actually participated' in the conduct giving rise to [the plaintiff's] claim of unlawful discrimination in violation of the NYSHRL").

Because Plaintiff has not established liability as to National Grid with respect to her NYSHRL claims of discrimination, retaliation, or hostile work environment, Plaintiff cannot establish Delach's individual liability for these claims.[32]

As to Plaintiff's hostile work environment claim under NYSHRL, Plaintiff relies on the Second Circuit's observation that "a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the [NYS]HRL." *Tomka*, 66 F.3d at 1317. However, establishing this threshold requirement is insufficient to preclude summary judgment, as an individual cannot be held liable for "aiding and abetting" his own discriminatory conduct in the absence of liability of the employer or another individual. *See Nunez*, 2012 WL 3241260, at *20 (E.D.N.Y. Aug. 7, 2012) ("An individual cannot be found liable under the NYSHRL for "aid[ing] and abet[ting] his own alleged discriminatory conduct." (citing *Raneri*, 712 F. Supp. 2d at 282 and *Strauss*, 805 N.Y.S.2d at 709)); *Virola*, 2008 WL 1766601, at *20 (E.D.N.Y. Apr. 15, 2008) ("An individual may not be held liable, however, merely for aiding and abetting his own discriminatory conduct but only for assisting another party in violating the NY[S]HRL." (citing *DeWitt v. Lieberman,* 48 F. Supp. 2d 280, 294 (E.D.N.Y. 1999) and *Strauss*, 805 N.Y.S.2d at 709)). Plaintiff has not established National

---

[32]  Although the Court's finding that there is no liability as to National Grid for a hostile work environment claim is based on National Grid's successful assertion of the *Faragher/Ellerth* affirmative defense establishing that any allegedly harassing conduct cannot be imputed to the National Grid, rather than on an assessment of whether Delach created a hostile work environment for Plaintiff, at least one other court, addressing the same scenario, found that an individual defendant could not be held liable pursuant to § 296(6) of the NYSHRL, where the company was shielded from liability because of the *Faragher/Ellerth* defense. *See Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 115 (E.D.N.Y. 2011) (addressing a claim "in which the *only* individual defendant against whom the claim can be brought is the alleged primary harasser, and in which the employer . . . is not liable pursuant to the *Faragher* defense," and noting that, "[l]ike Title VII, § 296 is, in essence, an *employment* discrimination statute, not an individual liability statute, even though individuals can, as noted, be liable under some circumstances.")

Grid's liability for creation of the claimed hostile work environment, nor has she shown that anyone other than Delach contributed to the creation of an allegedly hostile work environment. Without the liability of a principal whose discriminatory conduct Delach aided and abetted, Plaintiff cannot establish liability on the part of Delach under § 296(6) of the NYSHRL.

Plaintiff appears to argue that Delach is individually liable for her unequal pay. (Pl. Opp'n Mem. 25 ("Delach is personally responsible for the unequal pay.").) However, Plaintiff asserts individual liability against Delach only pursuant to the NYSHRL, (*see* Compl. ¶ 46), and Plaintiff has not asserted a claim of unequal pay pursuant to the NYSHRL. Plaintiff's unequal pay claim is brought solely under the Equal Pay Act, (*see* Compl. ¶ 44), and Plaintiff has not argued that the EPA provides for individual liability.[33]

Because Plaintiff has not established a basis for holding Delach liable for any discriminatory conduct, the Court grants summary judgment as to all claims of individual liability against Delach.

---

[33] "Although the Second Circuit Court of Appeals has not addressed whether the EPA provides for individual liability, at least one district court in this Circuit has held that it does." *Fayson v. Kaleida Health, Inc.*, No. 00-CV-0860, 2002 WL 31194559, at *4 (W.D.N.Y. Sept. 18, 2002) (citing *Bonner v. Guccione,* No. 94-CV-7735, 1997 WL 362311, at *13 (S.D.N.Y. July 1, 1997), *aff'd*, 71 F. App'x 875 (2d Cir. 2003). That court, looking to case law from Courts of Appeals in other circuits, noted that in determining individual liability, "courts examine the economic realities of the workplace, including whether the individual has operational control of the defendant corporation, an ownership interest, controls significant functions of the business or determines salaries and makes hiring decisions." *See Bonner*, No. 94-CV-7735, 1997 WL 362311, at *13 (S.D.N.Y. July 1, 1997) (citing *United States Dep't Lab. v. Cole Enterprises, Inc.*, 62 F.3d 775, 778 (6th Cir. 1995); *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993) (if individual dominates day-to-day control, no need for ownership interest to impose personal liability under Section 203(d)); *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983) and *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469–70 (9th Cir. 1983)). Here, as discussed *supra* in note 31, Delach lacked operational control of the corporation and any ownership interest, did not control significant functions of National Grid as a whole, or make decisions to hire or fire. While he did play a role with respect to determining salaries, as the record illustrates, it was not a determinative role. (*See* Delach Dep. 49:22–53:11.)

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to all claims.  The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 24, 2014
       Brooklyn, New York